**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

KRZYSZTOF SYWULA,

                                        Plaintiff,

        v.

TELEPORT MOBILITY, INC. *et al.*,

                                        Defendant.

Case No. 21-cv-1450-BAS-AGS

**ORDER:**

**(1)   DENYING TELEPORT'S MOTION TO STRIKE [ECF No. 65];**

**(2)   GRANTING PLAINTIFF'S MOTION TO SEAL [ECF No. 60]; and**

**(3)   DENYING MOTION TO DISMISS [ECF No. 65]**

A patent application must list each and every inventor who is responsible for developing the technology claimed therein. *See* 35 U.S.C. § 116(a) (providing that "[w]hen an invention is made by two or more persons jointly," the patent application must identify all such inventors); *see* 37 C.F.R. § 1.63(a)(2) (instructing patent applicant must "[i]dentify each inventor"); *see also id.* § 1.56 (instructing patent applicant "has a duty of candor and good faith in dealing with the United States Patent and Trademark Office" ("USPTO")). A putative inventor whose status has been omitted from a patent may petition a federal

- 1 -

court pursuant to 35 U.S.C. § 256 to direct the USPTO to correct that patent's inventorship acknowledgments. But the putative-inventor plaintiff must demonstrate he or she has Article III standing to do so.

Typically, a putative-inventor plaintiff demonstrates standing to seek correction by showing he or she has either: (1) an ownership interest in the disputed patent, *see*, *e.g.*, *Fina Oil & Chem. Co. v. Ewen*, 123 F.3d 1466, 1470 (Fed. Cir. 1997) ("*Fina Oil*"); or (2) a financial interest in being named an inventor of the disputed patent, *see*, *e.g.*, *Chou v. Univ. of Chi.*, 254 F.3d 1347, 1359 (Fed. Cir. 2001) ("*Chou*"). But in 2015, the Federal Circuit in *Shukh v. Seagate Technology LLC*, 803 F.3d 659 (Fed. Cir. 2015) ("*Shukh*"), held a putative-inventor plaintiff need not have an ownership or financial-interest in the disputed patent to bring a § 256 claim *if* the plaintiff can show a "concrete and particularized *reputational* injury" arising from the defendant's allegedly wrongful omission of inventorship status. *Id.* at 663 (emphasis added).

In the instant case, Plaintiff Krzysztof Sywula ("Sywula") seeks to correct several patents owned by Defendant Teleport Mobility, Inc. ("Teleport"), which relate to a software application for aggregating ride-sharing services. Sywula purports to have invented the Teleport patents' underlying technology but alleges that Defendants Alexis DaCosta ("DaCosta")—Teleport's majority shareholder—and Vincent Coletti ("Coletti")—DaCosta's business partner—wrongfully withheld inventorship credit in the patent applications.[1] However, Sywula has twice failed to demonstrate standing to pursue his § 256 claim.

---

[1] This action is one of three actions stemming from the Teleport business venture. There is also an action pending in the Northern District of California, in which Teleport alleges Sywula breached several agreements and misappropriated the entities' intellectual property. *Teleport Mobility Inc. v. Sywula*, 21-cv-00874 (N.D. Cal. filed Feb. 3, 2021) (the "Northern District Action"). The Northern District Action is currently stayed pending arbitration. *Id.*, ECF No. 49. Furthermore, around the same time Sywula filed this action, he filed another action in San Diego Superior Court, in which he essentially alleged Defendants Teleport, DaCosta, and Coletti "tried to run him out of the Teleport business and deny him the benefits of the invention that he created and rightfully owns." *Sywula v. DaCosta*, No. 21-cv-1456-BAS-AGS (the "Rescission Action"), 2022 WL 910217, at *2–3 (S.D. Cal. Mar. 29, 2022). The Rescission Action was removed to federal court, but was subsequently remanded. *Id.* at *10–11.

As explained in this Court's Order dismissing the First Amended Complaint (First Am. Compl., ECF No. 15) for lack of standing, Sywula has no ownership or financial interest in the Teleport patents. (Dismissal Order at 8–10, ECF No. 54.) Therefore, he is foreclosed from demonstrating Article III standing pursuant to *Fina Oil* and *Chou*. (*Id.*) Moreover, Sywula's prior attempt to invoke *Shukh* was unsuccessful. (*Id.* at 10–12.) Although Sywula has demonstrated Defendants' purported failure to credit him with inventing the technology claimed by the Teleport patents damaged his professional reputation, he has failed to show that reputational injury is a "concrete" one. (*Id.*) Without doing so, Sywula lacks standing to pursue correction of the Teleport patents. (*Id.*)

Nevertheless, the Dismissal Order left open the possibility Sywula can satisfy the standing requirements of *Shukh* if he is able to demonstrate his reputational injury has an "economic component," such as "loss of employment prospects or other opportunities." (Dismissal Order at 12 (quoting *Shukh*, 803 F.3d at 667).) On August 11, 2022, Sywula filed a pleading with new standing allegations designed to do just that; this pleading is styled as Sywula's "Second Amended Complaint." (Second Am. Compl., ECF No. 59.) It alleges, *inter alia*, that in early 2022 Sywula began seeking new employment opportunities beyond the Software Engineer position he held at Intel for approximately 12 years. However, because Defendants purportedly failed to properly recognize him as an inventor of the Teleport patents, Sywula alleges (1) he was unable to advance in rank within Intel and (2) another employer rescinded a job offer that was more lucrative than the position he ultimately secured.

Now before the Court is Teleport's Second Motion to Dismiss for lack of standing pursuant to Federal Rule of Civil Procedure ("Rule") 12(b)(1). (Second Mot. to Dismiss ("Rule 12(b)(1) Motion"), ECF No. 65-1.) Teleport argues all three prerequisite elements of Article III standing still are missing from Sywula's pleading. It also argues the extraneous facts it proffers alongside its Rule 12(b)(1) Motion dispossess this Court of jurisdiction. Those facts, Teleport asserts, demonstrate Sywula's loss of vocational

- 3 -

leverage and employment opportunities has nothing to do with Sywula's lack of published patents. Sywula opposes (Opp'n, ECF No. 70) and Teleport replies (Reply, ECF No. 72).

The Court finds resolution of Teleport's Rule 12(b)(1) Motion—and the parties' other pending motions relating thereto—is suitable without the need for oral argument. *See* Civ. L. R. 7.1(d)(1). For the reasons set forth below, Sywula has sufficiently invoked *Shukh* to demonstrate he has standing to pursue his § 256 claim.

## I.   BACKGROUND

The Court presumes the parties' familiarity with the facts and procedural history of this matter, which are principally set forth in this Court's Order denying Sywula's application for a temporary restraining order (ECF No. 27) and its Dismissal Order. The Court repeats that information here only to the extent necessary to frame the issues pertinent to the Motions now before it.

### A.   Sywula's First Amended Complaint and the Dismissal Order

As mentioned above, *see supra* Introduction, the Federal Circuit recognizes three distinct theories of standing in the § 256 context. *See Fina Oil*, 123 F.3d at 1470 (holding owner of disputed patent has standing to pursue § 256 claim); *Chou*, 254 F.3d at 1359 (holding plaintiff with financial interest in being named inventor of disputed patent has standing to pursue § 256 claim); *Shukh*, 803 F.3d at 663 (holding plaintiff who suffers concrete reputational injury from withholding of inventorship credit has standing to pursue § 256 claim). Sywula unsuccessfully sought to invoke all three in his First Amended Complaint.

Ownership Interest: Sywula alleged he has standing to pursue this inventorship action as "part-owner" of the Teleport patents. While he acknowledged he had assigned his ownership interest in the disputed patents to Teleport, he asserted those assignments are invalid. (FAC ¶ 73.) Hence, Sywula claimed he still retains ownership interest in the Teleport patents and, therefore, has standing to pursue this action under *Fina Oil*. (*Id.*); *see Fina Oil*, 123 F.3d at 1470.

The Court observed Sywula's ownership-interest theory of standing is viable *only* if the assignments to Teleport of his ownership interest in the subject patents are undone by judicial decree, which Sywula presently is litigating in the Rescission Action.  Noting that it has no jurisdiction to address the invalidity issue in the instant § 256 action, (Dismissal Order at 9 (citing *Larson v. Correct Craft, Inc.*, 569 F.3d 1319, 1327 (Fed. Cir. 2009); *Jim Arnold Corp. v. Hydrotech Sys., Inc.*, 109 F.3d 1567, 1571–72 (Fed. Cir. 1997))), this Court concluded Sywula cannot proceed on his ownership-interest theory "unless and until he regains title to the patents."  (*Id.* (quoting *Larson*, 569 F.3d at 1327).)

Financial Interest:  Sywula also asserted he possesses a financial interest in the disputed patents because he is a minority shareholder of Teleport, the entity that purportedly owns the patents.  (FAC ¶¶ 2, 31.)  Sywula claimed his stake in Teleport gave him a financial interest in the disputed patents and, therefore, standing to sue to correct their inventorship credits.  (*Id.*)  The Court disagreed and disposed of Sywula's financial-interest theory.  (Dismissal Order at 9.)  In doing so, it noted other courts have concluded with near uniformity a plaintiff's shareholder status in an entity that owns the disputed patent does not constitute a "concrete financial interest sufficient to confer standing."  (*Id.* (quoting *Eastwood v. Molecular Defs. Corp.*, 373 F. Supp. 3d 502, 507–08 (S.D.N.Y. 2009); citing additional authorities).)

Reputational Interest:  Finally, Sywula alleged his "omission from th[e] [Teleport] [p]atents has caused [him] concrete *reputational* harm[.]"  (FAC ¶ 74 (citing *Shukh*, 803 F.3d at 659) (emphasis added).)  Sywula identified three items of purported reputational injury; the first two relate to his professional reputation and the last to his personal reputation.   First, Sywula alleged Defendants' withholding of inventorship credit "depriv[ed] [him] of the public recognition and vocational leverage that comes from being named as an inventor on a patent in one's field."  (*Id.* ¶ 75.)  Second, he averred Defendants made diminishing statements about his contributions to the Teleport ride-sharing technology, which also "are harmful to Sywula's credibility as a reputable software engineer."  (*Id.*)  And third, Sywula claimed "reputational harm . . . based on . . . the intense

- 5 -

acrimony" arising from the various disputes between the parties, including publicly available police reports and a civil harassment restraining order DaCosta filed against him in Santa Clara County.  (*Id.* ¶ 76.)

The Court found Sywula's attempt to invoke *Shukh* unavailing.  As an initial matter, the Court concluded Sywula's allegations of personal reputational injury were neither fairly traceable to Defendants' omission of inventorship credit nor redressable by a favorable ruling in this case.  Moreover, it found Sywula failed to allege the injuries to his professional reputation are "concrete." (Dismissal Order at 10–12.)  Reciting *Shukh*'s legal premise (*see id.* at 10–11 ("[R]eputational injury alone is not sufficient; rather, it must be tied to economic consequences." (quoting *Kamdem-Ouaffo v. PepsiCo Inc.*, 657 F. App'x 949, 954 (Fed. Cir. 2016), *cert denied*, 137 S. Ct. 1096 (2017)))), the Court determined Sywula's failure to identify "economic harm or other concrete consequences" arising from is purportedly diminished reputation as a software developer precluded him from proceeding with his § 256 claim (*see id.*).

<u>Dismissal and Leave to Amend</u>:  This Court dismissed without prejudice the First Amended Complaint.  (Dismissal Order at 13 (citing *Kelly v. Fleetwood Enters., Inc.*, 377 F.3d 1034, 1036 (9th Cir. 2004)).)  But it granted Sywula a final opportunity to allege standing under *Shukh*.  (*Id.* (granting Sywula leave to amend "allegations concerning standing based on reputational injury").)

**B.    Second Amended Complaint**

In accordance with the Dismissal Order, Sywula filed his Second Amended Complaint on August 11, 2022.  It contains new standing allegations designed to show Sywula's alleged reputational injuries are concrete.  It also appends five declarations that corroborate and bolster these new allegations.

**1.    New Standing Allegations**

Sywula alleges he is a software developer "with significant experience in the field of software engineering, including the conception, design, development[,] and maintenance of complex software systems."  (SAC ¶ 12.)  He worked as a Software

Engineer at Intel for approximately 12 years.  (*Id.* ¶ 11.)  Beginning in 2010, Sywula worked for Intel in his home country of Poland.  (*Id.*)  He moved to Ireland in 2014, where he continued to work as a Software Engineer at Intel.  (*Id.*)  In 2015, he moved to the United States and started working for Intel in San Diego.  (*Id.*)  After approximately 12 years at Intel, Sywula began exploring new employment opportunities, both within Intel and elsewhere, in early 2022—well after he commenced this action.  (*Id.* ¶ 84.)

Sywula alleges he aspired to climb the ranks at Intel to the position of "Principal Engineer," which is the next step on Intel's hierarchical ladder for software developers.[2] (SAC ¶ 87, 91.)  Sywula avers he was "well-positioned" for a promotion.  According to Sywula, Intel "typically requires" Principal-Engineer candidates to have approximately ten years of experience as a software engineer; Sywula had approximately 12 years under his belt.  (*Id.* ¶¶ 84, 87.)  But Sywula alleges inventorship credit is "usually required for [S]oftware [E]ngineers to attain higher-ranked roles" like Principal Engineer.  (*Id.* ¶ 85.) He claims Intel was no different in this regard; there, patent-inventorship is an "important qualification" for prospective Principal Engineers.  (*Id.* ¶ 87; *see id.* ¶¶ 85–86 (alleging inventorship credit "signals" a candidate "can recognize niches in the market, recognize potentially patentable inventions where they exist, and ultimately transform an idea into a product").)  Sywula alleges Intel utilized a "nomination form" to assess internal candidates eligible for promotion to the Principal Engineer role, which designates inventorship credit as relevant to several of the skills and qualities needed for that position.  (*Id.* ¶ 87 ("On Intel's nomination form for Principal Engineers, patent publications are listed as a criterion in three different places, under categories for 'Expertise,' 'Leadership,' and 'Impact.'").)

Sywula alleges that had Defendants properly acknowledged his inventorship status in relation to the Teleport patents, he would have been able to show Intel he was a strong candidate for promotion.  (SAC ¶ 83.)  But because Defendants purportedly omitted him as inventor of the Teleport patents, he lacks any inventorship acknowledgments and,

---

[2] Sywula alleges Intel's peers follow a practically identical hierarchical structure for software-developer positions.  (*See* SAC ¶¶ 99, 108.)

therefore, was effectively foreclosed from "advance[ing] his career beyond the Software Engineer rank [at Intel]." (*Id.* ¶¶ 83–84.) Sywula alleges his prospects of promotion at Intel were so diminished by his lack of published patents that he did not even bother applying for a Principal Engineer role at Intel.[3] (*Id.* ¶¶ 83, 91.) "Colleagues [of Sywula], who worked in the software engineer hiring departments at [other major technology companies]," also expressed this sentiment to him. (*Id.* ¶ 81 (alleging colleagues advised Sywula "he would not be able to get hired as a Principal Engineer, or another role higher in rank than his current Software Engineer[] at Intel, or [at] any of the other major tech companies[,] due to his lack of inventorship on any patents").)

So, Sywula instead sought Software Engineer and equivalent opportunities outside of Intel. (SAC ¶ 92.) Specifically, in early 2022, Sywula applied for a Build Integration and Release Firmware Engineer position at Apple. (*Id.* ¶ 91.) An Apple recruiter verbally confirmed to Sywula in mid-March 2022 "he was selected for the role and that he should expect to receive a formal job offer shortly." (*Id.*) However, approximately one week later, the same recruiter informed Sywula that Apple decided not to extend an offer. (*Id.* ¶ 93.) The recruiter invited Sywula to call him for further explanation, which Sywula did. (*Id.*) During that telephone call, the recruiter stated Apple had conducted "an Internet search of [Sywula] as part of Apple's vetting process," and that Apple's "verbal offer was rescinded and no other Apple team would hire [Sywula]." (*Id.*)

Sywula alleges Apple's vetting process would have captured filings in this instant litigation, including Defendants' opposition to Sywula's application for a temporary restraining order, which contains statements that purportedly diminish Sywula's contributions to Teleport's ride-sharing application. (SAC ¶ 89; Defs.' Opp'n to TRO App., ECF No. 14.) In particular, that brief states: (1) Sywula was a "pair of hands" in relation to Teleport's ride-sharing technology, "who was engaged by [DaCosta and Coletti]

---

[3] Sywula avers he did not apply for Principal Engineer roles elsewhere because "[t]he typical path for obtaining [that] role . . . is to first hold a Principal Engineer role in [the applicant's] current company." (SAC ¶ 99.)

to bring their concept to reality"; and (2) Sywula's "*de minimis* involvement as company tech support during the creation of the inventions claimed in the patents does not rise to the level of joint inventorship."  (Defs.' Opp'n to TRO App. at 4, 24; *see also* SAC ¶¶ 89.) Sywula does not expressly allege the Apple recruiter attributed Apple's decision to renege its offer to Defendants' diminishing statements or that Apple ever saw these statements. However, Sywula does allege "employers commonly search job candidates' online presence in their vetting process, which would reveal [court filings]," such as Defendants' brief; that Apple conducted such a search; and that Apple reneged its offer to Sywula after doing so.  (SAC ¶¶ 90, 93.)

Ultimately, Sywula secured a Software Engineer position at TikTok in June 2022. (SAC ¶ 95.)  According to Sywula, he makes $42,000 less in annual compensation than what he would have made at Apple.  (*Id.* ¶¶ 96–97.)  He further avers his TikTok compensation package is in the range of $46,000 to $225,000 less than what a Principal Engineer at Intel earns per year.  (*Id.* ¶¶ 96, 98.)

### 2.    Annexed Declarations

Sywula appends five declarations to the Second Amended Complaint.  Four are from "longtime industry professionals."  (Opp'n at 9.)  One declaration is from Maciej Peplinski, an Intel hiring manager (ECF No. 59-2); one is from Maciej Kusio, a Principal Engineer at Meta who formerly worked at Intel (ECF No. 59-3); one is from Manoel Ramon, a Senior Technical Program Manager at Google who previously worked at Intel and Amazon (ECF No. 59-4); and one is from Calvin Park, a Principal Engineer at Apple who formerly worked at Intel (ECF No. 59-5).  Peplinski attests she advised Sywula in early 2022 not to bother seeking a promotion at Intel given his lack of inventorship credit and to focus his job search on Software Engineer positions elsewhere instead.  (Peplinski Decl. ¶¶ 8–9.) All four declarants attest Sywula's lack of inventorship credit significantly diminished his candidacy for Principal Engineer at Intel.  (*See id.*; Kusio Decl. ¶¶ 3–5 (attesting that "patent inventorship is desirable for all software engineer positions and is practically required for higher positions" and that Sywula "would be qualified for [Principal Engineer]

- 9 -

absent this inventorship issue"); Ramon Decl. ¶ 4 ("If I had to choose between two engineers with the same qualifications, I will select the candidate that can produce or participate in IPs and publications."); Park Decl. ¶ 7 ("Being named on published patents is an important qualification to become a Principal Engineer.").)

The fifth declaration is Sywula's own. (ECF No. 59-1.) It appends several documents. Two of those attachments are internal Intel documents: a "Principal Engineer and Senior Principal Engineer Nomination Form" ("Intel Nomination Form") and a copy of an Intel informational power point ("Intel Presentation").[4] Sywula proffers these documents—the relevant contents of which are described in Paragraph 87 of the Second Amended Complaint—to demonstrate Intel places important emphasis on patent-inventorship credit in determining whether to elevate a Software Engineer to Principal Engineer.

### 3. The Instant Motions

On August 24, 2022, Teleport moved pursuant to Rule 12(b)(1) to dismiss Sywula's Second Amended Complaint. Teleport argues Sywula's refined reputational-interest theory is still facially deficient. It further proffers extraneous materials, which Teleport asserts dispossess this Court of jurisdiction. Simply put, Teleport claims Sywula does not—and cannot—show he suffered a "concrete" reputational injury that is either fairly traceable to Defendants' omission of inventorship credit in the Teleport patents or redressable by a favorable ruling in the instant case. Accordingly, Teleport claims Sywula lacks standing to pursue his § 256 claim.

Teleport's Rule 12(b)(1) Motion also features a Motion to Strike all five of the declarations appended to the Second Amended Complaint. It asserts that Rule 10(c) prohibits attachment of such documents to pleadings and that the appropriate remedy is to expunge those declarations from the record under Rule 12(f). (Rule 12(b)(1) Mot. at 7–9.)

---

[4] These documents are lodged under seal at ECF No. 58.

Sywula, on the other hand, moves to seal the Intel Nomination Form and Presentation, which are annexed to his Declaration.  (Sealing Mot., ECF No. 60.)

## II.   LEGAL STANDARD

Article III, Section 2 of the Constitution limits federal courts to hearing "actual cases or controversies." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 337 (2016).  This limitation means the plaintiff must have standing to sue.  *Id.* at 338.  To establish standing, a plaintiff must demonstrate the irreducible constitutional minimum of:  (1) an injury-in-fact via "an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical"; (2) causation—that the injury is "fairly traceable to the challenged action of the defendant"; and (3) redressability—that it is "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992) (internal citations and quotations omitted).  "Each element of standing 'must be supported . . . with the manner and degree of evidence required at the successive stage of litigation.'"  *Maya v. Centex Corp.*, 658 F.3d 1060, 1068 (9th Cir. 2011) (quoting *Lujan*, 504 U.S. at 561).

Under Rule 12(b)(1), a party may move to dismiss a claim based on lack of subject matter jurisdiction, including the absence of standing.  *Chandler v. State Farm Mut. Auto. Ins. Co.*, 598 F.3d 1115, 1123 (9th Cir. 2010).  A Rule 12(b)(1) challenge to jurisdiction may be facial or factual.  *Safe Air for Everyone v. Meyer*, 373 F.3d 1036, 1039 (9th Cir. 2004), *cert denied*, 544 U.S. 1018 (2005).  Teleport's Motion to Dismiss contains both types of jurisdictional challenges.

In a facial attack, the challenger asserts the allegations in the complaint itself are insufficient to invoke federal jurisdiction.  *Meyer*, 373 F.3d at 1039.  The presumption of truthfulness attaches to the allegations in the complaint, and the court is limited to the four corners of the pleading in determining whether it has jurisdiction over the matter. *Thornhill Publ'g Co. v. Gen. Tel. Elec.*, 594 F.2d 730, 733 (9th Cir. 1979).  To survive a Rule 12(b)(1) facial challenge, "the plaintiff must 'clearly . . . allege facts demonstrating' each element

[of standing]." *Spokeo*, 578 U.S. at 338 (quoting *Warth v. Seldin*, 422 U.S. 490, 518 (1975)).

When a defendant makes a factual challenge "by presenting affidavits or other evidence properly brought before the court, the party opposing the motion must furnish affidavits or other evidence necessary to satisfy its burden of establishing subject matter jurisdiction." *Meyer*, 373 F.3d at 1039 (citation omitted). The court need not presume the truthfulness of the plaintiff's allegations under a factual attack. *White v. Lee*, 227 F.3d 1214, 1242 (9th Cir. 2000); *Augustine v. United States*, 704 F.2d 1074, 1077 (9th Cir. 1983). However, in the absence of a full-fledged evidentiary hearing, disputes in the facts pertinent to subject matter jurisdiction are viewed in the light most favorable to the opposing party. *Dreier v. United States*, 106 F.3d 844, 847 (9th Cir. 1996). The disputed facts related to subject matter jurisdiction should be treated in the same way as one would adjudicate a motion for summary judgment. *Id.*

## III.   ANALYSIS

### A.   Motion to Strike

Citing Rule 10(c), Teleport argues the declarations appended to the Second Amended Complaint must be stricken. (Rule 12(b)(1) Mot. at 7–9.) Sywula does not explicitly oppose this request. (Opp'n at 5 ("[T]he Court may find [Teleport's Motion to Dismiss] suitable for denial without relying on the declarations[.]").)

Rule 10(c) provides, "A copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes." In the Ninth Circuit, a declaration is a "written instrument" suitable to annex to a pleading only if it "form[s] the basis of the complaint." *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003). For example, a search-warrant affidavit that purportedly contains false information "forms the basis" of a Fourth Amendment claim challenging the unlawful search that affidavit authorized and, thus, is appropriate to append to, and construe as part of, the pleading. *See Branch v. Tunnell*, 14 F.3d 449, 450–54 (9th Cir. 1994). However, a declaration that merely repeats and bolsters allegations already contained in the complaint, and, therefore, has no independent

- 12 -

significance beyond amplifying and parroting facts already set forth in the pleading, does not "form[] the basis" thereof. *See, e.g.*, *Montgomery v. Buege*, No. Civ. 08-385-WBS KHM, 2009 WL 1034518, at *4 (E.D. Cal. Apr. 16, 2009). The five declarations Sywula appends to his Second Amended Complaint fall within the ambit of this latter category. The attestations therein merely repeat or corroborate factual allegations set forth in the Second Amended Complaint. (*See, e.g.*, SAC ¶ 91 (alleging Sywula's colleagues believed his chances at promotion were dim due to his lack of inventorship credit and that he was advised not to apply).) Therefore, Rule 10(c) prohibits this Court from construing these declarations as part of the Second Amended Complaint and, thus, from considering them in connection with Teleport's facial challenge to subject matter jurisdiction. *See Meyer*, 373 F.3d at 1039.

However, Teleport does not simply ask this Court to ignore the Peplinski, Kusio, Ramon, Park, and Sywula Declarations in addressing the facial strand of Teleport's jurisdictional challenge; Teleport asks the Court to strike those declarations from the record entirely. (Rule 12(b)(1) Mot. at 7–9.) Doing so would preclude this Court from considering those declarations in analyzing the *factual* strand of Teleport's Rule 12(b)(1) Motion. This is a bridge too far. While courts are limited to the four corners of the complaint when deciding a facial Rule 12(b)(1) challenge, they have broad discretion to consider extrinsic evidence—including declarations and the documents appended thereto—in assessing a factual jurisdictional challenge. *See, e.g.*, *Stuart v. Colo. Interstate Gas Co.*, 271 F.3d 1221, 1225 (10th Cir. 2001) (opining district courts have "wide discretion to allow affidavits [and] other documents . . . to resolve disputed jurisdictional facts"); *accord Shaw v. Hiawatha, Inc.*, 884 F.2d 582 (9th Cir. 1989) (Memorandum Decision) (similar).

In the ordinary course of a factual challenge, the opposing party will proffer evidence seeking to establish subject matter jurisdiction *in response* to such a challenge. Sywula indisputably proffered the declarations prematurely and in a peculiar sequence. But Teleport does not cite any authority supporting the proposition this Court must ignore the

declarations appended to the Second Amended Complaint in assessing Teleport's factual challenge to jurisdiction. *Cf.* Fed. R. Civ. P. 12(f) ("The court *may* strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter.") (emphasis added). Rather, the Court has wide latitude to consider the "entire record" and assess whether any evidence therein bears upon the issues put into contention by a factual challenge to subject matter jurisdiction. *See CapitalKeys, LLC v. Democratic Rep. of Congo*, No. 15-cv-2079 (KBJ), 2021 WL 2255362, at *19 (D.D.C. June 3, 2021) (Brown Jackson, J.); *see also CSR Ltd. v. CIGNA Corp.*, 405 F. Supp. 2d 526, 533 n.3 (noting district court has "authority . . . to consider the entire record" under Rule 12(b)(1)). Several of the declarations, here, do bear squarely upon Teleport's factual challenge. *See* Sec. III.D.2. For example, Teleport argues Sywula's loss of vocational leverage had little to do with his lack of inventorship credit and more to do with his own self-inflicted reputational injuries. The Intel Nomination Form and Presentation, which highlight patent publications as a relevant criterion for promotion, relate to this proposition. And Teleport asserts Sywula foregoing an application for a promotion at Intel demonstrates he had no interest in the Principal Engineer position. Attestations in the Peplinski Declaration, however, offer another explanation for Sywula's failure to formally apply for the job.

Accordingly, the Court **DENIES** Teleport's Motion to Strike and construes the Second Amended Complaint's five declarations—and their attachments—as though they were proffered alongside Sywula's Opposition.

## B. Sealing Motion

Having resolved Teleport's Motion to Strike, the Court turns next to Sywula's request to seal two internal Intel files appended to his declaration: the Intel Nomination Form and Presentation. (*See* Sealing Mot.)

As explained in the Second Amended Complaint, Sywula had access to these documents by virtue of his former employment with Intel. They are offered to corroborate Sywula's allegation that Intel considers patent inventorship as indicative of the qualities and experience necessary to be promoted to Principal Engineer. (*See* Sealing Mot. at 2;

*see also* SAC ¶¶ 86–87.)  Sywula argues sealing the Intel files is warranted because courts have traditionally found the public does not have the right to access internal corporate documents.  (Sealing Mot. at 3 (citing *Charles v. Target Corp.*, No. 20-cv-7854-HSG, 2022 WL 3205047, at *3 (N.D. Cal. July 6, 2022) ("[I]nternal document[s] detailing [a corporation]'s internal policies and procedures . . . divulges confidential business information.")).)  Moreover, Sywula asserts the Second Amended Complaint discloses at Paragraph 87 the relevant content of the Intel Nomination Form and Presentation, and explains how they support Sywula's claimed reputational injury.  Therefore, Sywula avers the documents themselves are inessential to understanding this Court's standing analysis.  (*Id.*)

Although Teleport moved to strike the Sywula Declaration, it does not oppose the Sealing Motion.  But Teleport's silence does not absolve this Court's duty to scrutinize Sywula's request.  Teleport's interest in accessing the proposed sealed documents is not the only one at stake.  The public also has a "common law right 'to inspect and copy public records and documents, including judicial records and documents,'" *Pintos v. Pac. Creditors Ass'n*, 605 F.3d 665, 678 (9th Cir. 2010) (quoting *Kamakana v. City & Cty. of Honolulu*, 447 F.3d 1172, 1178 (9th Cir. 2006)), and an interest "in understanding the judicial process" in a given case, *Kamakana*, 447 F.3d at 1178–79.  It is the Court's role to protect against improper infringement of that public right and interest.

"Unless a particular court record is one 'traditionally kept secret,' a 'strong presumption in favor of access' is the starting point." *Kamakana*, 447 F.3d at 1178 (citing *Foltz v. State Farm Mut. Auto Ins. Co.*, 331 F.3d 1125, 1135 (9th Cir. 2003)).  The Ninth Circuit has designated only a few categories of documents that courts "traditionally ke[ep] secret":  (1) grand jury transcripts; (2) the closed portions of contempt proceedings containing discussion of matters occurring before the grand jury; (3) filings and transcripts relating to motions to quash grand jury subpoenas; (4) motions to hold a grand jury witness in contempt; (5) warrant materials during the pre-indictment phase of an investigation; and (6) attorney-client privileged materials.  *Kamakana*, 447 at 1178 (identifying grand jury

- 15 -

transcripts and warrant materials); *United States v. Index Newspapers LLC*, 766 F.3d 1072, 1084–85 (9th Cir. 2014) (expanding category to include filings and motions relating to grand jury proceedings).  Despite Sywula's bald assertion otherwise, business records pertaining to a company's hiring standards do not fall within this limited—and rarely expanded classification—of material to which no First Amendment right attaches.  Hence, it is Sywula's burden to overcome the "presumption in favor of access" as to the internal Intel documents.  *Foltz*, 331 F.3d at 1135.

The strength of the showing required depends upon whether the documents to be sealed are offered in connection with a motion that is "more than tangentially related to the merits of the case."  *Ctr. for Auto Safety v. Chrysler Grp., LLC*, 809 F.3d 1092, 1102 (9th Cir. 2016).  When the underlying motion is more than tangentially related to the merits, the "compelling-reasons" standard applies.  *Id.* at 1096–98.  But when the underlying motion does not surpass the tangential relevance threshold, the "good-cause" standard applies.  *Id.*

Here, Sywula assumes the Rule 12(b)(1) Motion is more than tangentially related to the merits of the case and, thus, presupposes the compelling-reasons standard applies. (Sealing Mot. at 3.)  The Court disagrees.  Teleport's Rule 12(b)(1) Motion attacks this Court's jurisdiction over Sywula's suit.  Teleport avers in its Rule 12(b)(1) Motion that Sywula has not identified a cognizable injury in the first instance to vindicate his rights under § 256; that Motion is not intertwined with, and does not bear at all upon, the issue whether Sywula is an "inventor" of the Teleport patents under 35 U.S.C. § 101.  Nor are the documents proposed to be sealed at all pertinent to the merits of Sywula's § 256 claim; the Intel files bear only upon whether Defendants' withholding of inventorship credit caused Sywula economic harm in the form of loss of vocational leverage—a purely jurisdictional issue.  Therefore, the Rule 12(b)(1) Motion's relation to the merits of this § 256 action is tangential.  Hence, the good-cause standard applies.  *Cf. Rodriguez v. Just Brands USA, Inc.*, No. 2:20-cv-04829-DDW (PLAx), 2022 WL 2181098, at *2 (C.D. Cal Mar. 1, 2022) (finding good-cause standard governed request to seal documents submitted

21cv1450

alongside Rule 12(b)(1) motion that went "to a jurisdictional question rather than directly to the merits of [p]laintiff's claims").

The good-cause standard is borrowed from Rule 26(c), which authorizes a court to issue a protective order for materials produced during discovery. *See Pintos*, 605 F.3d at 678 (citing Fed. R. Civ. P. 26(b)). The test applied is whether "'good cause' exists to protect th[e] information from being disclosed to the public by balancing the needs for discovery against the need for confidentiality." *Id.* (quoting *Phillips ex rel. Estates of Byrd v. Gen. Motors Corp.*, 307 F.3d 1206, 1213 (9th Cir. 2002)). Except, in the context of a motion to seal, the Court substitutes the party seeking discovery's interest in production with the *public's* interest in accessing the underlying, potentially dispositive materials in order to comprehend the facts that ultimately inform a court's decision. *Cf. id.* (instructing courts to apply good-cause standard from Rule 26 to balance public's interest in documents marked sealed with the interest in secrecy). Under Rule 26(c), only "a particularized showing of 'good cause' . . . is sufficient to preserve the secrecy of sealed . . . documents." *In re Midland Nat. Life Ins. Co. Annuity Sales Practices Litig.*, 686 F.3d 1115, 1119 (9th Cir. 2012) (emphasis added). "Broad allegations of harm, unsubstantiated by specific examples or articulated reasoning, do not satisfy the Rule 26(c) test." *Beckman Indus., Inc. v. Int'l Ins. Co.*, 966 F.2d 470, 476 (9th Cir. 1992). Sywula satisfies this standard.

To start, Sywula summarizes the relevant portions of the Intel Nomination Form and Presentation in the Second Amended Complains, and explains how that information pertains to an alleged economic component of Sywula's reputational injury. By doing so, Sywula has made available to the public the relevant facts about the Intel Nomination Form and Presentation that inform this Court's standing analysis. The Second Amended Complaint's disclosure of this information, therefore, substantially lessens the public's need to access the files themselves. Furthermore, apart from a single page, the voluminous Intel Presentation largely contains irrelevant information that this Court need not—and does not—rely upon in determining Sywula's standing. This information does not enhance the public's understanding of the instant judicial proceeding. *See Apple Inc. v. Samsung*

- 17 -

*Elecs. Co.*, 727 F.3d 1214, 1226 (Fed. Cir. 2013) (finding the public has a more limited interest accessing information in proposed seal documents that would not "assist . . . in understanding the proceedings in th[e] case").

On the opposite side of the scale is Intel's interest in nondisclosure. There is reason to find disclosure of the files has the propensity to harm non-party Intel. As an initial matter, Intel designated Exhibit 2 as "Intel confidential," demonstrating that it did not intend for those files to be shared beyond Intel employees and that, in the event of disclosure, that Intel sought to retain at least some measure of protection to ensure against the widespread dissemination of those materials. Ordinarily, "a *party's* designation of a document as confidential is not *per se* good cause" under Rule 26. *Marsteller v. MD Helicopter Inc.*, No. CV-14-01788-PHX-DLR, 2017 WL 5479927, at *2 (D. Ariz. Nov. 15, 2017) (first emphasis added) (citing *San Jose Mercury News, Inc. v. U.S. Dist. Ct.–N. Dist. (San Jose)*, 187 F.3d 1096, 1103 (9th Cir. 1999)). However, Intel is a *non-party* to the instant action. Intel did not introduce its internal documents to the record—Sywula did. Indeed, it does not appear Intel is even aware its former employee, Sywula, filed "confidential," internal documents. Because Intel has not had opportunity to be heard on the issue, the Court affords some weight to Intel's confidential designation of its Presentation.

Moreover, Intel's interest in keeping proprietary business information private is self-evident. *Cf. Carpenter v. United States*, 484 U.S. 19, 25–26 (1987) ("Confidential business information has long been recognized as property . . . Confidential information acquired or compiled by a corporation in the course and conduct of its business is a species of property to which the corporation has the exclusive right and benefit, and which a court of equity will protect through . . . [an] appropriate remedy." (citations and quotation marks omitted)). Disclosure of the standards Intel relies upon when considering whether to hire or promote a candidate to Principal Engineer could feasibly impact Intel's competitive standing in its industry.

1    Given Intel's status as a nonparty and, moreover, the public's minimal interest in
2    disclosure of the Intel Nomination Form and Presentation, the Court finds Sywula's
3    proposed seal is warranted after weighing the competing interests.  Accordingly, Sywula's
4    Sealing Motion is **GRANTED**.  (ECF No. 60.)

5        **C.**    **Propriety of New Standing Allegations Under Rule 15(d)**

6        Before it can address the substance of Teleport's Rule 12(b)(1) Motion, the Court
7    must address the threshold question whether Sywula's new standing allegations comport
8    with the scope of the Dismissal Order's leave to amend under Rule 15(a) and, if not,
9    whether the new standing allegations are nevertheless permissible.

10       Rule 15(a) governs *amended* pleadings.  Rule 15(a)(1) confers litigants with a right
11   to amend once as a matter of course and Rule 15(a)(2) covers all other amendments.  When
12   the latter applies, "a party may amend its pleading only with the opposing party's written
13   consent or the court's leave."  Fed. R. Civ. P. 15(a)(2).  Rule 15(d) covers *supplemental*
14   pleadings.  Supplemental pleadings differ from amended ones because they "se[t] out . . .
15   transaction[s], occurrence[s] or event[s] that happened after the date of the pleading to be
16   supplemented."  *Id.* 15(d); *see Eid v. Alaska Airlines, Inc.*, 621 F.3d 858, 874 (9th Cir.
17   2010).

18       Although not raised by Teleport, the Dismissal Order granted Sywula leave to
19   *amend*, not leave to *supplement*.  But Sywula's new standing allegations are supplemental
20   ones because they detail events that occurred *after* Sywula instituted this action.  Hence,
21   these allegations are covered by the letter of Rule 15(d), not Rule 15(a).  Yet this Court has
22   not conducted any Rule 15(d) analysis to satisfy itself the new standing allegations are
23   permissible.  It undertakes that endeavor now.

24       "[T]he erroneous characterization of the corrected pleading as an 'amended
25   complaint' rather than a supplemental pleading is immaterial."  *United States for use of*
26   *Atkins v. Reiten*, 313 F.2d 673, 674–75 (9th Cir. 1963).  Therefore, it matters not that
27   Sywula fashions his new pleading as his Second Amended Complaint.  Rather, Rule 15(d)
28   "is intended to give the court broad discretion in allowing supplemental pleading."  Fed.

R. Civ. P. 15 Advisory Committee Notes to 1963 Amendment.  It explicitly allows courts to permit supplementation of a prior pleading "on just terms."  Fed. R. Civ. P. 15(d).

Where, as here, the newly alleged material unquestionably relates to the matters set forth in the original complaint, the only inquiry that remains is whether supplementation will "promote speedy disposition of the entire controversy," or whether it will prejudice the responding party. *Keith v. Volpe*, 858 F.2d 467, 474–75 (9th Cir. 1988) (citing *Lerman v. Chuckleberry Publ'g, Inc.*, 521 F. Supp. 228, 231–32 (S.D.N.Y. 1981)); *see also Lyon v. U.S Immigration & Customs Enf't*, 308 F.R.D. 203, 214 (N.D. Cal. 2015) (identifying the five factors commonly used to evaluate a motion for leave to amend—"(1) undue delay, (2) bad faith or dilatory motive on the part of the movant, (3) repeated failure of previous amendments, (4) undue prejudice to the opposing party, and (5) futility of the amendment"—should be used to evaluate a motion for leave to supplement (quoting *Forman v. Davis*, 371 U.S. 178, 182 (1962))).  To permit supplementation here comports with the core efficiency interests enshrined by the Federal Rules of Civil Procedure, including Rule 15(d), and would not inflict any apparent prejudice upon Defendants.

The Federal Rules of Civil Procedure are designed "to simplify judicial procedure, to adjudicate all phases of litigation involving the same parties, and to avoid a multiplicity of suits."  *H.F.G. Co. v. Pioneer Publ'g Co.*, 7 F.R.D. 654, 656 (N.D. Ill. 1947), *cited approvingly by Keith*, 858 F.2d at 475.  Declining Sywula's attempt to supplement his last deficient pleading with new standing allegations would require Sywula to return to square one and file a new suit alleging precisely the same § 256 claim, just to argue all over again the cogency of his reputational-interest theory of Article III standing.  Rule 15(d) is crafted to ameliorate the expense and hassle that would otherwise arise in these exact circumstances.

Furthermore, Teleport does not assert undue prejudice from Sywula's new standing allegations.  Nor could it.  This is not an instance in which a plaintiff seeks to bring a new claim after substantial time and resources have been devoted to litigating the case, thus requiring the defendant to completely modify its legal theories and obtain new discovery

- 20 -

to prepare an adequate defense near trial. *E.g.*, *Eagle View Techs., Inc. v. Xactware Sols., Inc.* No. C12-1913-RSM, 2013 WL 6086311, at \*\*2–4 (W.D. Wash. Nov. 18, 2013). Nor is this an instance in which a plaintiff seeks to supplement a claim that already has been adjudicated to final disposition in defendant's favor with new facts or legal theories, effectively starting afresh a litigation that the defendant had reason to believe was nearing its end.[5]  *See Planned Parenthood of S. Ariz. v. Neely*, 130 F.3d 400, 401–02 (9th Cir. 1997). The propensity for prejudice in those scenarios is readily apparent. By contrast, here, the Dismissal Order subsumed the possibility Teleport and the rest of Defendants would need to respond to modified standing allegations and, perhaps, litigate Sywula's § 256 claim if Sywula could show he has standing to proceed. That Order is, by its nature, transient.

Accordingly, the Court finds joinder of Sywula's new standing allegations appropriate under Rule 15(d) and, therefore, turns to Teleport's Rule 12(b)(1) Motion.

### D.  Rule 12(b)(1) Motion

Teleport moves to dismiss the Second Amended Complaint pursuant to Rule 12(b)(1), launching both facial and factual challenges to Sywula's alleged bases for Article III standing to proceed with his § 256 action under *Shukh*. In response, Sywula claims his Second Amended Complaint adequately invokes *Shukh* and that the extraneous evidence he proffers adequately rebuts Teleport's factual challenge.

Below, the Court first takes a moment to paint the legal landscape in which this action takes place, and then to addresses Teleport's facial and factual challenges in turn.

//

//

//

---

[5] Notably, there is no statute of limitations for correction of inventorship pursuant to 35 U.S.C. § 256. *See Stark v. Advanced Magnetics, Inc.*, 29 F.3d 1570, 1573 (Fed. Cir. 1994) ("Section 256 does not limit the time during which inventorship can be corrected.") (citation omitted). Hence, Sywula's supplemental allegations are not time-barred and the Court need not undertake any undertake any relation-back analysis under Rule 15(c).

### 1.   *Shukh* **and its Progenies**

In the years prior to *Shukh*, several district courts held reputational injury derived from omitted inventorship status could give rise to Article III standing to pursue a claim under § 256.   *See Czarnik v. Illumina, Inc.*, 437 F. Supp. 2d 252, 256–57 (D. Del. 2006) (holding putative-inventor plaintiff satisfied Article III standing requirement by showing omission from a disputed patent harmed plaintiff's reputation in the scientific community, deprived the plaintiff of prestige, and impacted the plaintiff's ability to secure a lucrative position); *Krauser v. Evollution IP Holding, Inc.*, 975 F. Supp. 2d 1247, 1261 (S.D. Fla. 2013) (analogizing to defamation law to vindicate reputational-interest theory of standing). However, it was not until *Shukh* the Federal Circuit sanctioned that legal premise.   803 F.3d at 663.

*Shukh* involved "a leading scientist in the field of semiconductor physics and an established inventor," Dr. Alexander Shukh, who had been employed by the defendant, Seagate Technology, for approximately 12 years until his termination in 2009.   Dr. Shukh alleged, *inter alia*, Seagate failed to properly credit him for inventing technology claimed by six of Seagate's patents.   However, by signing and executing his Seagate employment agreement, Dr. Shukh assigned to Seagate all his "right, title, and interest in and to" the inventions he developed during his tenure.   Nevertheless, Dr. Shukh commenced an action against Seagate, asserting a claim pursuant to § 256.   *Shukh*, 803 F.3d at 661–63.

Seagate moved to dismiss Dr. Shukh's § 256 claim, arguing Dr. Shukh's employment agreement foreclosed standing.   *Shukh*, 803 F.3d at 661.   The trial court agreed with Seagate that Dr. Shukh lacked standing under *Chou* and *Fina Oil*; however, it "left open the possibility that Dr. Shukh had standing to sue based on *reputational harm* caused by his omission from the disputed patents."   *Id.* at 662.

Two years later, Seagate moved for summary judgment on Dr. Shukh's § 256 claim, contending Dr. Shukh could not sustain his reputational-interest theory of standing.   *Shukh v. Seagate Tech., LLC*, No. 10-404 (JRT/JJK), 2013 WL 1197403, at *1 (D. Minn. Mar. 5, 2013), *aff'd in part, vacated in part Shukh*, 803 F.3d at 659.   Dr. Shukh opposed.   *Id.* at *1.

He argued Seagate's omission had injured his professional reputation by depriving him of additional prestige and adding fodder to his existent reputation as a poor co-worker who accused others of stealing his inventions, in support of which he proffered testimonial evidence. *Id.* at \*4–7, \*10–12. He further averred these reputational injuries produced economic consequences, namely, his inability to secure employment in his field post-Seagate. *Id.*, at \*12. Dr. Shukh attributed "his failure to be hired to blacklisting and rumors instigated by Seagate." *Id.* To demonstrate the connection, Dr. Shukh proffered evidence showing that during his interview with Hitachi—a peer company of Seagate to which he unsuccessfully applied for employment—"a Hitachi engineer allegedly told [Dr.] Shukh that '[w]ith your reputation you will not find employ[ment] here.'" *Id.*, at \*5.[6]

Based on the evidence proffered, the *Shukh* trial court ultimately held there existed no genuine dispute of material fact as to whether Dr. Shukh suffered a reputational harm sufficient to confer standing and ruled in favor of Seagate. In so holding, the *Shukh* trial court found Dr. Shukh had failed to establish each of the three elements of Article III standing: injury-in-fact; causation; and redressability. As to injury, the *Shukh* trial court found Dr. Shukh had failed to show Seagate's omission had any impact on either Dr. Shukh's reputation as a leading scientist in the field of semiconductor physics *or* his reputation as a difficult co-worker. *Shukh*, 2013 WL 1197403, at \*10. After reviewing testimonial evidence proffered by Dr. Shukh, it concluded that Dr. Shukh had these reputations prior to his dispute with Seagate, and that Seagate's purported withholding of inventorship credit in six patents did not alter Dr. Shukh's repute in these areas. *Id.* at \*10–11 (construing evidence as demonstrating (1) Dr. Shukh's "reputation as an internationally

---

[6] Notably, Dr. Shukh also argued he suffered economic consequences as a result of Seagate's omission *while still employed* by Seagate. *See* Dr. Shukh's Opp'n to Mot. for Summ. J. at 27, *Shukh v. Seagate Tech., LLC*, No. 10-cv-404 JRT/JJK (D. Minn. filed July 20, 2012) ("Dr. Shukh's Opp'n"), ECF No. 323; *see also Shukh*, 2013 WL 1197403, at \*11 n.14. In particular, Dr. Shukh testified at his deposition he was damaged "*by the loss of promotions*," just as Sywula alleges here. *See* Dr. Shukh's Opp'n at 27 (emphasis added). The *Shukh* trial court found this injury to be "entirely speculative," and, thus, did not recognize it as part of the "economic component" of Dr. Shukh's purported reputational injury in the body of its Opinion. *Shukh*, 2013 WL 1197403, at \*11 n.14.

renowned inventor in his field did not change after he was not named as an inventor on the six disputed patents" and (2) Dr. Shukh's "reputation for accusing others of stealing his work and insisting on credit for all of his ideas was established well before the disputed patents became an issue between [Dr.] Shukh and Seagate").

But the *Shukh* trial court determined that even if Seagate's omission had deprived Dr. Shukh of additional, attendant reputational prestige, Dr. Shukh failed to proffer evidence showing his inability to obtain employment stemmed from that injury. *Shukh*, 2013 WL 1197403, at *12. Citing Dr. Shukh's own allegations, the *Shukh* trial court noted the complaint identified "rumors" about Dr. Shukh's difficult personality as the cause of his inability to obtain employment post-Seagate, not Seagate's omission. *Id.* ("[Dr.] Shukh's failure to obtain other employment as a result of rumors instigated by Seagate is irrelevant to the question of whether [Dr.] Shukh's reputation was damaged when he was not named as an inventor of the six disputed patents."). Thus, as to causation, the *Shukh* trial court concluded, "Because [Dr.] Shukh has presented no evidence indicating that being omitted from six patents resulted in his ability to find other employment," Dr. Shukh lacked standing to pursue his § 256 claim. *Id.*

Finally, as to redressability, the *Shukh* trial court held that if Dr. Shukh had shown Seagate's omission had "negatively affected [his] reputation as a scientist," then "[s]ubsequent correction of inventorship could redress the reputational damage, as the inventor would be considered more innovative, creative, and technically skilled as a result of being named on the patent." *Shukh*, 2013 WL 1197403, at *11. But Dr. Shukh failed to demonstrate any such reputational injury to redress. And the *Shukh* trial court further concluded that to the extent Seagate's omission—and the subsequent inventorship litigation—had made Dr. Shukh even more notorious for seeking credit, correcting the disputed patents could not redress that injury. *Id.* at *11.

Dr. Shukh appealed, placing before the Federal Circuit the question whether reputational injury is sufficient to confer standing in the § 256 context and, if so, precisely when. *Shukh*, 803 F.3d at 659. The Federal Circuit answered the first question posed

affirmatively, reasoning a "concrete and particularized reputational injury" may give rise to standing. *Id.* at 663. It further instructed a reputational injury is "concrete" only when it can be shown to have an "economic component," such as affecting the putative-inventor plaintiff's employment. *Id.*

Applying this standard to the facts proffered on summary judgment, the Federal Circuit first concluded the *Shukh* trial court had failed to properly recognize Dr. Shukh's reputational injuries stemming from Seagate's omission and, therefore, had misanalysed each of the standing elements. It found evidence developed in the record could demonstrate two items of reputational harm: (1) that Seagate's omission injured Dr. Shukh's "reputation as an inventor in the field of semiconductor physics" because his "reputation as an inventor would have been higher had he been named on the patents"; and (2) the omission could, in fact, have "contributed to [Dr. Shukh's] reputation for poor teamwork due in part to his accusations that others were stealing his work." 803 F.3d at 664–65. Simply put, the Federal Circuit rejected the notion accepted by the *Shukh* trial court that Dr. Shukh's professional reputation essentially was set in stone prior to his dispute with Seagate, and found a genuine dispute of fact existed whether the omission of inventorship credit in a few patents can affect the professional reputation of an established inventor.

Having determined Dr. Shukh demonstrated a reputational injury, the Federal Circuit turned to whether Dr. Shukh adequately demonstrated "his alleged reputational harm had an economic component." *Shukh*, 803 F.3d at 667. The Federal Circuit concluded he had done so by establishing he could not find employment post-Seagate. *Id.* Moreover, the Federal Circuit held Dr. Shukh had sufficiently shown his inability to obtain employment was fairly traceable to his purported reputational injuries and, thus, Seagate's omission, because: (1) logic dictates "the stronger Dr. Shukh's reputation as an inventor, the more likely he is to be hired"; and (2) the statement Hitachi's engineer told Dr. Shukh during a job interview supported the notion Dr. Shukh's difficult personality—which was further perpetuated by Seagate's omission—was a reason for his prolonged unemployment. *Id.*

- 25 -

21cv1450

Finally, the Federal Circuit held a genuine dispute of fact existed whether favorable decision on Dr. Shukh's § 256 claim could redress both Dr. Shukh's damaged reputation *and* his inability to find employment.  *Shukh*, 803 F.3d at 665, 667.  Specifically, the Federal Circuit concluded a trier of fact reasonably could infer correcting the disputed patents would award Dr. Shukh with additional repute as an inventor, "rehabilitate" his reputation for poor teamwork, and improve his employment prospects.  *Id.* at 665.  *Id.*

Accordingly, the Federal Circuit vacated the district court's summary judgment ruling on Dr. Shukh's § 256 claim and remanded.

*Shukh* vindicates the rights of putative inventors who have assigned away all their rights in an invention—whether due to a lopsided power dynamic between the putative inventor and his or her employer or otherwise—to pursue correction of the inventorship acknowledgments in the patent at issue.  Yet despite this seemingly momentous decision, this Court's own research reveals no putative-inventor plaintiff has successfully invoked *Shukh* to establish Article III standing to pursue a § 256 claim.

Since *Shukh*, the Federal Circuit has in unpublished opinions twice rejected the attempts of putative-inventor plaintiffs to invoke *Shukh* at the pleading stage.  In *Kamdem-Ouaffo v. PepsiCo, Inc.*, the Federal Circuit affirmed a trial court's rejection of a putative inventor's reputational-interest theory of standing.  657 F. App'x at 954.  There, the plaintiff's complaint merely alleged, "Plaintiff sustains and/or might sustain damages in terms of the loss of ownership, inventorship, and the honor for his Intellectual Property." *Id.*  The Federal Circuit held the plaintiff had alleged a pure reputational injury without any "economic consequences, such as loss of employment prospects," and thus could not proceed under *Shukh*.  *Id.* (citing *Shukh*, 803 F.3d at 663).  In *Huster v. j2 Cloud Services, Inc.*, the Federal Circuit summarily rejected the putative-inventor plaintiff's claimed standing under *Shukh* where she merely alleged patent acknowledgment can impact an inventor's reputation, but did not allege or proffer evidence showing she suffered any reputational injury herself.  682 F. App'x 910, 916 (Fed. Cir. 2017).

- 26 -

Three trial courts also have addressed standing in § 256 actions in which the putative-inventor plaintiffs sought to invoke *Shukh*.  Like the Federal Circuit, those courts also rejected the reputational-interest theory of standing arguments with which they were presented, finding the putative-inventor plaintiffs had failed to allege a "concrete" reputational injury.  In *Pedersen v. Geschwind*, the Honorable James K. Bredar, District of Maryland, applied *Shukh* to the § 256 claim of a plaintiff who sought to challenge his *inclusion* as inventor on disputed patents.  141 F. Supp. 3d 405 (D. Md. 2015).  The operative pleading alleged his "status as a fair and honest academician is and will be adversely affected" unless his co-inventor status was removed from the patents.  *Id.* at 417.  Judge Bredar found this lone allegation simply "raise[d] a pure reputational interest," as opposed to one tied to a concrete, economic injury, and, thus, was too nebulous to give rise to standing.  *Id.* at 416–17.  In *VariBlend Dual Dispensing Systems LLC v. Crystal International (Group) Inc.*, the Honorable Edgardo Ramos, Southern District of New York, applied *Shukh* to a § 256 claim practically identical to the one asserted in *Pedersen*.  No. 18 Civ. 10758 (ER), 2019 WL 4805771, at *15 (Sept. 30, 2019).  Judge Ramos held the plaintiff's bald assertion of reputational harm in his complaint—that his inventorship status "placed a cloud over his business activities and reputation"—failed to establish the concrete and particularized injury needed to proceed.  *Id.*  And finally, in *Feuss v. Enica Engineering, PLLC*, the Honorable Kevin McNulty, District of New Jersey, similarly applied *Shukh* to the claim of putative inventors who merely alleged that inventorship credit would confer them "reputational benefit."  Civ. No. 20-2034 (KM) (JBC), 2021 WL 1153146, at *4 (D.N.J. Mar. 26, 2021). Judge McNulty found the plaintiff's alleged reputational injury to be insufficiently concrete.  *Id.*

Taken together, *Shukh* and its progenies stand for the legal premise that, to have standing absent an ownership or financial interest in the disputed patent, it is necessary but not sufficient for the putative-inventor plaintiff to allege reputational damage arising from the purportedly wrongful omission of his or her inventorship status.   The injury also must be a "concrete" one to confer Article III standing.  *See*, *e.g.*, *Kamdem-Ouaffo*, 657 F. App'x

- 27 -

at 954 (opining *Shukh* does not authorize standing when the "sole claim of injury" is plaintiff's bare assertion he will "sustain and/or might sustain" reputation injury).  To show concreteness, the putative-inventor plaintiff must identify an "economic consequence[]" flowing from the alleged reputational injury.  *Shukh*, 803 F.3d at 663.

Put differently, the reputational injury *Shukh* recognizes as conferring Article III standing is not the loss of "the dignity of and accompanying self-satisfaction of official inventorship recognition" arising out of wrongful omission of inventorship status.  *See* Dennis Crouch, *Reattribution, The Poison Pill & Inventorship*, 5 BUS. ENTREPRENEURSHIP & TAX L. REV. 138, 144 (Fall 2021).  These benefits of inventorship recognition simply are too nebulous.  *E.g.*, *Kamdem-Ouaffo*, 657 F. App'x at 954; *Pedersen*, 141 F. Supp. 3d at 417–18; *VariBlend*, 2019 WL 4805771, at *15.  Instead, *Shukh* cabins cognizable reputational injuries to those that materialize in the loss of benefits flowing from inventorship that have an economic flavor:  employment opportunities, vocational leverage, and other pecuniary consequences that stem from the public recognition that patent-inventorship credit provides.  *See Pedersen*, 141 F. Supp. 3d at 417; *see also Shukh*, 803 F.3d at 663.  The loss of these sorts of benefits is pecuniary in nature and, thus, is concrete.

### 2.     Facial Challenge

As explained above, *see supra* Sec. I.A, this Court already found Sywula sufficiently alleged two items of reputational damage stemming from Defendants' purported omission of inventorship credit.  <u>First</u>, Sywula alleged his omission from the Teleport patents artificially restrains his reputation as a software engineer from reaching its true potential.  Had Defendants properly recognized him as a co-inventor of the disputed patents, Sywula alleges his professional reputation would have been higher.  <u>Second</u>, Sywula sufficiently alleged that Defendants' omission gave an air of legitimacy to their subsequent diminishing statements about Sywula's contributions to the ride-sharing technology and painted Sywula in a negative light for pursuing his § 256 claim.  (*See* Dismissal Order at 11–12 ("When generously construed, these allegations state an injury that is comparable to the first two

- 28 -

items of reputational harm considered in *Shukh*: injury to Sywula's reputation in his field of work and a negative reputation arising from his claim Teleport wrongly omitted him from the patents.").) These allegations all are repeated in the Second Amended Complaint. (SAC ¶¶ 83–103, 107–10.)

However, this Court found the First Amended Complaint failed to allege these reputational injuries had an "economic component," without which Sywula cannot invoke *Shukh*. (*See* Dismissal Order at 12 ("Missing [are] any allegations concerning economic harm or concrete consequences." (citing, *inter alia*, *Shukh*, 803 F.3d at 663, 667)).)

Sywula now seeks to identify economic consequences arising from both his alleged reputational injuries. Teleport asserts the Second Amended Complaint still is devoid of factual allegations to support the "irreducible constitutional minimum" of Article III standing: (1) an injury-in-fact; (2) a causal link between the injury-in-fact and the conduct complained of; and (3) redressability. (*See* Rule 12(b)(1) Mot.); *Lujan*, 504 U.S. at 560–61.

### a.    Loss of Vocational Leverage

Sywula alleges Defendants' omission of his inventorship status in the Teleport patents deprived him of the "vocational leverage that comes from being named as an inventor on a patent in one's field." (SAC ¶ 82.) In particular, he avers Defendants' omission effectively doomed his prospects for promotion at Intel from Software Engineer to the higher-ranking Principal Engineer role. (*Id.* ¶¶ 84–91.) Teleport contends Sywula's alleged inability to advance within Intel is too nebulous and speculative to be considered a "concrete" economic consequence; Sywula has failed to demonstrate his loss of vocational leverage is "fairly traceable" to Defendants' omission; and correcting the disputed patents will not ameliorate Sywula's inability to move up the hierarchical ladder at Intel. (Rule 12(b)(1) Mot. at 11–14.) Contrary to Teleport's assertion otherwise, the Court finds the Second Amended Complaint has adequately alleged a reputational-interest theory under *Shukh* to establish Article III standing to pursue his § 256 claim.

//

### i.     Injury-in-Fact

"To establish injury in fact, a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'"  *Spokeo*, 578 U.S. at 339 (quoting *Lujan*, 504 U.S. at 560).   For a putative-inventor plaintiff who seeks to vindicate his or her § 256 rights pursuant to a reputational-interest theory of standing, that means showing the "alleged reputational harm [attributable to the omission of inventorship credit] had an *economic component*."  *Shukh*, 803 F.3d at 666–67.

In *Shukh*, the Federal Circuit opined that, "[W]hen the claimed inventor is employed or seeks to be employed in the field of his or her claimed invention," "[p]ecuniary consequences may well flow from being designated as an inventor."  803 F.3d at 663.  For that reason, *Shukh* instructs, "[I]f the claimed inventor can show that being named as an inventor on a patent would *affect* his employment, the alleged reputational injury likely has an economic component sufficient to demonstrate Article III standing."  *Id.* (emphasis added).

Sywula has shown just that. Sywula adequately pleads he sought employment in the field of his claimed invention.  (SAC ¶¶ 84–87); *see Shukh*, 803 F.3d at 663.  That is, Sywula, a software developer who purportedly architected, developed, and wrote the software for Teleport's ride-sharing application, alleges he aspired to climb the hierarchical ladder for software developers and obtain a Principal Engineer role.  (*Id.* ¶¶ 11, 87.) Sywula also adequately pleads Teleport's omission "affect[ed] his employment" by severely diminishing, if not foreclosing entirely, his opportunity for a promotion to Principal Engineer at Intel.  (*See id.* ¶¶ 85–88, 91); *see Shukh*, 803 F.3d at 663.  Importantly, he alleges the prospects of his promotion from Software Engineer to Principal Engineer at Intel were not merely illusory or wishful thinking.  He claims to have met nearly all of Intel's experience- and skills-based criteria to be eligible for a promotion.  (*See id.* ¶ 83.) However, he is missing one purportedly crucial qualification:  he cannot claim to be an inventor of any patented technology.  According to Sywula, "[p]ublished patents are

21cv1450

usually required for software engineers to attain higher-ranked roles." (*Id.* ¶ 85.) And Intel, in particular, considers published patents as relevant to at least three qualities and skills it looks for in prospective Principal Engineers. (*See id.* ¶ 87 ("On Intel's nomination form for Principal Engineers, patent publications are listed as a criterion in three different places, under categories for 'Expertise,' 'Leadership,' and 'Impact.'").)

Simply put, the Second Amended Complaint contains enough factual material for this Court to infer Defendants' withholding of inventorship credit in the Teleport patents plausibly diminished or even foreclosed his prospects of career-advancement at Intel and, more generally, in whatever software-developer position he holds or will hold. Hence, Defendants' omission plausibly strips Sywula of the pecuniary benefits attendant to promotion. Accordingly, Sywula has adequately alleged an economic component to one of his reputational injuries.

The Court is unconvinced by Teleport's argument Sywula's loss of vocational leverage is hypothetical. To be concrete, Teleport avers, Sywula needed to have unsuccessfully applied for the Principal Engineer position at Intel. Without doing so, it cannot be known whether Intel would have passed over him for promotion and, thus, whether Sywula would have sustained an economic injury. (*See* Rule 12(b)(1) Mot. at 13 ("The injury of missing out on career advancement is entirely speculative and conjectural where Sywula did not even apply for the job.").) But the economic impact Sywula's lack of inventorship credit had upon Sywula's professional reputation and, thus, his prospect for promotion to Principal Engineer is not conjectural at all. Assuming all the facts alleged in the Second Amended Complaint as true, and gleaning all reasonable inferences therefrom in Sywula's favor as this Court must, inventorship is a critical consideration for career advancement among software developers. The Court need not strain to infer Sywula's inability to call himself an inventor weakens his candidacy as to any higher-ranking and better-paying position for which patent inventorship is relevant—including the Principal Engineer position at Intel. That injury carries with it those pecuniary consequences that accompany career advancement, *e.g.*, a higher salary.

1    Finding otherwise would be to turn a blind eye to a concept twice recognized by the

2    Federal Circuit.  "[B]eing considered an inventor of important subject matter is a mark of

3    success in one's field, comparable to being an author of an important scientific paper."

4    *Shukh*, 803 F.3d at 663 (quoting *Chou*, 254 F.3d at 1359).  Because they are indicators of

5    an inventor's innovative, creative, and technical skill in the field of the underlying

6    invention, patents serve an important credentialling function for employers in evaluating

7    prospective job candidates.  Jason Rantanen & Sarah E. Jack, *Patents As Credentials*, 76

8    WASH. & LEE REV. 311, 339–62 (Winter 2019) (describing how prospective employers

9    rely upon patents in evaluating job candidates).  "Being recognized as an inventor will . . .

10   increase an employee-inventor's marketability as a potential employee, both outside and

11   within the company where he or she is currently employed."  Emily A. Sample, *Assigned*

12   *All My Rights Away: The Overuse of Assignment Provisions in Contracts for Patent Rights*,

13   104 IOWA L. REV. 447, 470 (November 2018) (citing *Chou*, 254 F.3d at 1359).  Indeed,

14   Sywula expressly alleges Intel employs patents as a credentialing device in hiring Principal

15   Engineers.  (*See* SAC ¶ 87.)

16   Teleport's argument might be more compelling if Sywula were more similarly

17   situated to Dr. Shukh.  When Dr. Shukh sought employment post-Seagate he already had

18   been recognized as an inventor of "twenty United States patents."  *Shukh*, 2013 WL

19   1197403, at *3.  Unlike Dr. Shukh, Sywula had no patents to his name—besides the

20   disputed Teleport patents—when he began exploring the prospects of promotion at Intel.

21   Hence, Sywula's status as an inventor is contingent upon whether he can claim

22   inventorship credit in the Teleport patents.  In other words, unless the Teleport patents are

23   corrected, the economic benefits accessible to those who attain inventorship status are out

24   of reach for Sywula.  *See Pedersen*, 141 F. Supp. 3d at 417 ("At bottom the reputational

25   interest recognized by a handful of courts and now sanctioned by the Federal Circuit is an

26   interest in the benefits that flow from inventorship:  public recognition; vocational

27   leverage; and pecuniary gain.  These benefits are concrete and fairly traceable to named

28   inventorship on a patent[.]").

21cv1450

Because Sywula has plausibly alleged his lack of inventorship credit effectively dashes his prospects of promotion to the higher-ranking Principal Engineer position, he has adequately shown an economic consequence attributable to his reputational injury sufficient to pass muster of a facial attack under Rule 12(b)(1).

### ii.    Causation

To survive a motion to dismiss for lack of Article III standing, a "plaintiff[] must establish a 'line of causation' between defendants' action and their alleged harm that is more than 'attenuated.'" *Maya*, 658 F.3d at 1070 (quoting *Allen v. Wright*, 468 U.S. 737, 757 (1984)). A causal chain does not fail simply because there are several links so long as those links are not hypothetical or tenuous, but rather are plausible. *Id.* (citing *Nat'l Audubon Soc., Inc. v. Davis*, 307 F.3d 835, 849 (9th Cir. 2002)). Indeed, the alleged injury must be "fairly traceable" to Defendants' conduct. *Spokeo*, 578 U.S. at 338. "This is akin to but-for causation, not proximate causation." *Adam v. Barone*, 41 F.4th 230, 235 (3d Cir. 2022) (citing *Mielo v. Steak 'n Shake Operations., Inc.*, 897 F.3d 467, 481 (3d Cir. 2018). "But-for causation is established whenever an injury would not have occurred without the alleged action or event." *Id.* (citing *Univ. of Tex. S.W. Med. Ctr. v. Nassar*, 570 U.S. 338, 346–47 (2013)). On the other hand, proximate causation requires the plaintiff to establish the "injury is sufficiently related to the action or event that the law deems the injury to have been caused by the action or event." *Id.* (citing *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 132–34 (2014)).

Teleport avers Sywula's loss of vocational leverage is not fairly traceable to Defendants' omission of inventorship credit on the Teleport patents. (Rule 12(b)(1) Mot. at 13.) Teleport claims the Second Amended Complaint does not foreclose that factors having nothing to do with the underlying inventorship issue stripped Sywula of vocational leverage. In so arguing, Teleport clearly alludes both to the fact that employers, like Intel, examine many different factors when selecting the most qualified person for a competitive position and, moreover, to Teleport's theory that Sywula sullied his own reputation through

his work performance at Intel and the manner in which he left Teleport.[7] But this argument misapprehends Ninth Circuit law. In this Circuit, a plaintiff "need not eliminate any other contributing causes" beyond the defendant's purportedly wrongful conduct "to establish [his or her] standing." *Barnum Timber Co. v. U.S. E.P.A.*, 633 F.3d 894, 901 (9th Cir. 2011) (citing *Ocean Advocates v. U.S. Army Corps of Engr's*, 402 F.3d 846, 860 (9th Cir. 2005)). Indeed, "other factors may also cause" the injury-in-fact upon which a plaintiff predicates his or her standing, but if "the link between the [defendant's challenged action] and [the alleged injury] is not tenuous or abstract," those extraneous factors do not break the causal connection. *Id.*

The Second Amended Complaint alleges a sufficiently cogent nexus for this Court to infer Sywula's omission from the Teleport patents contributed to Sywula's loss of vocational leverage. Sywula avers "[p]ublished patents are usually required for software engineers to attain higher-ranked roles," like Principal Engineer. (SAC ¶ 85.) Indeed, according to Sywula, large technology companies, like Intel, use patent-inventorship credit to assess job candidates: he alleges inventorship credit "signals to . . . hiring manager[s] that the candidate can recognize niches in the market, recognize potentially patentable inventions where they exist, and ultimately transform an idea into a product." (*Id.* ¶ 86.) Moreover, he alleges Intel, itself, utilized patent-inventorship credit as an "important" factor in making Principal Engineer hiring decisions. (*Id.* ¶ 87.) The Second Amended Complaint alleges that Intel's Nomination Form for Principal Engineers lists patent publications as relevant to whether a candidate has the "[e]xpertise" and "[l]eadership" qualities necessary for the job and to whether a candidate has made an "[i]mpact" in the field of the subject patent one might expect for a high-ranking Intel employee. (*Id.*); *see supra* Sec. III.B. From these allegations, the Court has no trouble gleaning that but for

---

[7] In its factual challenge, Teleport specifies what it contends are the more likely reasons Intel did not promote—or would not have promoted—Sywula during his tenure. *See infra* Sec. III.D.3. But because the Second Amended Complaint is bereft of those underlying facts, this Court does not consider them in Teleport's facial challenge. *See Thornhill Publ'g.*, 594 F.2d at 733.

Defendants' purportedly wrongful omission of Sywula from the Teleport patents, Sywula would have been a stronger candidate for Intel's more lucrative Principal Engineer position.

### iii. Redressability

To establish standing, it is not enough that the plaintiff's injury is "concrete and particularized" and "fairly traceable" to the defendant's challenged conduct. A plaintiff must also demonstrate the relief he or she seeks will "likely" remediate the injury upon which standing is premised. *Lujan*, 504 U.S. at 560–61. In a § 256 action, a court can issue but one remedy: an order directing the USPTO to correct the inventorship acknowledgments in the disputed patent(s). *See* 35 U.S.C. § 256; *Shukh*, 803 F.3d at 665.

Although it acknowledges that an order directing the USPTO to correct the disputed patents will redress Sywula's *reputational* injury, Teleport contends this Court lacks the power to issue a remedy that would ameliorate Sywula's alleged *economic* injury. "A favorable ruling in this case," Teleport avers, "will not elevate [Sywula's] rank or make him a Principal Engineer at Intel" because "[h]e has already departed Intel and does not allege an intent to return there." (Reply at 6.)

But Teleport's argument sees the forest for the trees. Again, *Shukh* is instructive. There, Dr. Shukh's inability to obtain employment post-Seagate comprised the economic component of the reputational harm he had sustained from Seagate's withholding of inventorship credit. Dr. Shukh unsuccessfully applied to over 100 jobs, including to one at Hitachi. The *Shukh* trial court lacked authority to reinstate Dr. Shukh at Seagate or to reverse the hiring decisions of any one of Seagate's peer companies who rejected Dr. Shukh's application. Still, the Federal Circuit held Dr. Shukh's economic injury was redressable because "a trier of fact could infer that Dr. Shukh's employment prospects would improve if the inventorship of the disputed patents was corrected." *Shukh*, 803 F.3d at 667. Similarly, here, if Sywula prevails in this lawsuit, he will be able to present himself to potential employers as a software engineer *and* inventor, which, in turn, will improve

21cv1450

his marketability and, thus, his range of employment opportunities. *Id.* at 666.  Therefore, Sywula has adequately alleged his reputational injuries are redressable.

Accordingly, Teleport's facial challenge to Sywula's reputational-interest theory of standing fails to the extent it is directed at Sywula's loss-of-vocational-leverage allegations.

*     *     *     *

Having concluded Sywula's allegations concerning his loss of vocational leverage within Intel are sufficient on their face to confer Article III standing, this Court need not analyze Sywula's second claimed basis for standing:  Apple's revocation of its Build Integration and Release Firmware Engineer offer in early 2022.  Nevertheless, it does so in the interest of completeness.

### b.     Apple's Rescinded Job Offer

Sywula alleges he applied for a Build Integration and Release Firmware Engineer position at Apple in early 2022.  (SAC ¶ 92.)  After interviewing for the job, an Apple recruiter gave him verbal confirmation in mid-March 2022 that he had been selected for the role and that he should expect to receive a formal job offer.  (*Id.*)  However, a few weeks later, the Apple recruiter rescinded Sywula's offer.   (*Id.* ¶ 93.) The recruiter informed Sywula Apple had revoked the offer following its vetting process.  (*Id.*)

Sywula alleges that Apple's vetting process would have included an "[i]nternet search" of Sywula's "online presence."  (SAC ¶¶ 90, 93.)  According to Sywula, that search would have unearthed two statements Defendants made during this litigation that downplay Sywula's contribution to the technologies claimed by the Teleport patents and cast him as merely bringing DaCosta's ideas and instructions to life.  (*See id.* ¶¶ 89–93; Defs.' Opp'n to TRO App. at 4, 23–24.)  Sywula attributes Apple's revocation to the negative reputation perpetuated by these diminishing statements.  (*See* SAC ¶¶ 90, 93.) Although Sywula ultimately secured a Software Engineer position with TikTok, that job pays approximately $42,000 less than the revoked position at Apple.  (*See id.* ¶¶ 96–97.)

Teleport contends these facts do not support Article III standing. (Rule 12(b)(1) Mot. at 15–18.) Specifically, Teleport claims Sywula cannot rely upon Apple's revocation for standing purposes because that purported injury is based upon statements that are protected under California's litigation privilege. (*Id.* at 18.) Furthermore, Teleport avers Apple's revocation is not "concrete" because it is unclear from the face of the Second Amended Complaint whether Sywula is worse off financially having taken the TikTok job. (*Id.* at 16 & n.10.) Finally, Teleport argues the causal link between Sywula's omission from the Teleport patents and Apple's revocation is too attenuated.[8] (*Id.* at 15–17.)

### i. Injury-in-Fact

California's Litigation Privilege: Teleport argues that California's litigation privilege, codified at California Civil Code § 47(b), precludes Apple's revocation as a basis for standing. (Rule 12(b)(1) Mot. at 18.) California Civil Code § 47(b) provides immunity from tort liability for statements made in connection with a judicial proceeding. The California Supreme Court has formulated this privilege as applicable to "any communication '(1) made in judicial or quasi-judicial proceedings; (2) by litigants or other participants authorized by law; (3) to achieve the objects of the litigation; and (4) that ha[s] some connection or logical relation to the action.'" *Graham-Sult v. Clainos*, 756 F.3d 724, 741 (9th Cir. 2014) (quoting *Mansell v. Otto*, 108 Cal. App. 4th 265, 271 (2003)). Teleport contends standing to pursue this § 256 action cannot rest upon Apple's revocation because Sywula alleges that injury stemmed from Apple unearthing two statements Defendants made in the instant litigation. Teleport's argument is misguided.

California's litigation privilege is inapplicable here because the federal law of privilege—not California law—applies in purely federal question cases such as this. *Lewis v. United States*, 517 F.2d 236, 237 (9th Cir. 1975) ("[I]n federal question cases the clear weight of authority and logic supports reference to federal law on the issue of the existence and scope of an asserted privilege." (citing *Heathman v. United States Dist. Ct. for the*

---

[8] Notably, Teleport advances the same redressability argument as it did with respect to Sywula's loss-of-vocational-leverage allegations. *See supra* Sec. III.D.1.a.iii.

*Cent. Dist. of Cal.*, 503 F.2d 1032, 1034 (9th Cir. 1974)).  Teleport does not cite a single instance in which the Ninth Circuit has applied California's litigation privilege in a federal question case, and this Court's own research discloses that the Ninth Circuit has refused to recognize that privilege as a matter of federal common law.  *Religious Tech. Ctr. v. Wollersheim*, 971 F.2d 364, 367 n.10 (9th Cir. 1992).  Even if California's litigation privilege was recognized as part of the federal common law of privileges (it has not been), it would still be inapplicable here because the instant action does not sound in tort.  This matter is purely one for correction of inventorship under § 256.  There is no remedy this Court can issue that would expose Defendants to tort liability.  *Cf. Graham-Sult*, 756 F.3d at 741 ("The privilege 'immunizes defendants from virtually any *tort liability* (including claims of fraud), with the sole exception of causes of action for malicious prosecution.'" (quoting *Olsen v. Harbison*, 191 Cal. App. 4th 325, 333 (2010) (emphasis added)).  Accordingly, Teleport cannot utilize California's litigation privilege to preclude this Court from recognizing an injury-in-fact that flows from Defendants' diminishing statements.

<u>Concreteness</u>:  Teleport asserts that Apple's revocation is not a "concrete" injury because "Sywula does not allege the composition of" his TikTok compensation package, *e.g.*, "how much was salary vs. bonus, vs. stock, what the qualifying metrics were for the bonus and stock, and whether the stock was a grant or option." (Rule 12(b)(1) Mot. at 15–16.)  Thus, Teleport insinuates, the Second Amended Complaint does not provide firm basis upon which to infer Sywula is financially worse off at TikTok than he otherwise would have been at Apple.  But this level of detail is not needed for Sywula to defeat a motion on the pleadings.  Sywula has demonstrated adequately his economic position was harmed by Apple's revocation by alleging Apple's total annual compensation package was approximately $42,000 more valuable than his current compensation package at TikTok. (*See* SAC ¶¶ 96–97.)

//

//

//

1

### ii.   Causation

2   Teleport advances three arguments in an attempt to break the causal chain between

3   Defendants' omission of inventorship credit and Apple reneging its offer to Sywula.  All

4   fail.

5   First, Teleport argues that even assuming Apple rescinded Sywula's offer due to

6   Defendants' diminishing statements, the reputational injury inflicted by those statements

7   is not fairly traceable to Defendants' withholding of Sywula's inventorship credit.  (Reply

8   at 6 n.4.)   This Court disagrees. Defendants' diminishing statements inflict harm to

9   Sywula's professional reputation in two distinct ways.  Most obviously, the diminishing

10  statements perpetuate the damage Defendants already wrought upon Sywula's reputation

11  by omitting him from the Teleport patents.  That is, Defendants' statements provide further

12  confirmation in the eyes of outsiders that Sywula is not an inventor of Teleport patents and,

13  therefore, has invented nothing in his 12 years as a Software Engineer.  Teleport is correct

14  that Apple's revocation is not fairly traceable to this strand of reputational injury.  The

15  Second Amended Complaint does not allege Apple reneged its offer because Sywula is not

16  an inventor.   Indeed, Sywula alleges he applied to Apple precisely because other

17  opportunities were foreclosed by his lack of published patents.  (SAC ¶ 92.)

18  But Defendants' diminishing statements also give rise to a second reputational

19  injury, which, although not explicitly alleged, is plausibly inferable from the Second

20  Amended Complaint and is akin to one of the reputational injuries identified in *Shukh*.

21  That is, the diminishing statements, along with the instant litigation, cast Sywula as a

22  disgruntled employee who will sue to obtain inventorship credit in patented technology he

23  did not actually create.  *Cf. Shukh*, 803 F.3d at 666 (finding Dr. Shukh had a "reputation

24  for poor teamwork" and that "his disputes with Seagate over his omission from the patents

25  and this subsequent lawsuit have likely significantly worsened Dr. Shukh's reputation on

26  this front").  This strand of reputational injury is fairly traceable to Defendants' omission

27

28

of Sywula from the patents.[9]  Moreover, it is clear how this negative reputation would cause Apple to renege its offer:  if true, Defendants' statements suggest Sywula is willing to sue his employer if he is not listed as an inventor in technology on which he works during his employment, even if he objectively does not qualify for inventor status.  It is plausible Apple concluded on that basis the risk of adding Sywula to its team is not worth the reward and, thus, did not move forward with Sywula's offer.

Second, Teleport argues there exist many other, more plausible reasons Apple rescinded its offer to Sywula after vetting him.  Because this assertion relies upon extraneous facts submitted with Teleport's Motion to Dismiss, the Court reserves consideration of this argument to the portion of this Order addressing Teleport's factual challenge to subject matter jurisdiction below, *see infra* Sec. III.D.2.

Finally, Teleport argues the Second Amended Complaint does not allege Apple ever discovered Defendants' diminishing statements and, thus, Sywula's assertion Apple chose to rescind its job offer on that basis is purely speculative.  (*See* Reply at 6–7 ("[Sywula] cannot plausibly allege that any of the alleged [diminishing] statements [caused Apple to rescind its job offer because] Sywula does not, and cannot, allege the reason for why . . . Apple rescinded its job offer other than to state that it was based on an 'internet search.'").)  In support of that argument, Teleport contrasts Sywula's allegations to the evidence offered on summary judgment in *Shukh*.  (*Id.* at 7.)  There, Dr. Shukh presented evidence that Hitachi rejected his job application due to "rumors" about his negative reputation that Seagate personnel had shared with Hitachi personnel, and that a Hitachi manager "told Dr. Shukh during his interview that he would never find employment at Hitachi with his reputation."  803 F.3d at 662.  By contrast, here, Sywula alleges only that Apple rescinded

---

[9] Teleport claims this Court previously held the reputational injury inflicted by Defendants' "statements made in judicial proceedings relating to Sywula's job function at Teleport" are not fairly traceable to Defendants' omission of Sywula from the disputed patents (Rule 12(b)(1) Mot. at 15 (citing Dismissal Order at 11).)  That is not so.  In its Dismissal Order, this Court held Sywula failed to "plausibly allege that a reputational injury stemming from *police reports and a state court civil restraining order* is fairly traceable to the omission of his inventorship." (Dismissal Order at 11.)  This is distinct and separate from the claimed reputational injury arising from the above-referenced diminishing statements.

its offer following an "internet search" as part of its vetting procedures, and that such a search would have disclosed Defendants' diminishing statements.

Teleport's reliance upon the summary judgment decision in *Shukh* is misplaced given the difference in procedural posture between the two cases.  The relevant question at this early stage of proceedings is not whether Sywula has presented evidence tending to show Apple actually uncovered Defendants' diminishing statements.  That information is likely to be uniquely in the custody and control of Apple, and Sywula cannot be expected to represent that fact in good faith absent third-party discovery.  Rather, the relevant question here is whether Second Amended Complaint contains factual allegations that— when construed in the light most favorable to Sywula—permit a plausible inference Apple discovered Defendants' publicly available diminishing statements when it vetted Sywula.

This Court finds the complaint in *Shukh* far more instructive in this regard.   *See* Complaint, *Shukh v. Seagate Tech., LLC*, 0:10-cv-00404-JRT-JJK (D. Minn. Jan. 4, 2012), ECF No. 258-3 ("*Shukh* Compl.").   The *Shukh* Complaint is bereft of allegations concerning Dr. Shukh's application to Hitachi; those facts only entered the record on summary judgment.   Rather, all the *Shukh* Complaint alleged is that Dr. Shukh had unsuccessfully applied "to other companies for jobs within the field of his special expertise" following his termination from Seagate.  *Shukh* Compl. ¶ 259.  Like Sywula, he did not articulate the reason why his applications were unsuccessful.  *Id.*  Rather, he alleged that he was "informed by other employees of Seagate that there [were] 'rumors' out there about him, which he *believe*[*d*] ha[d] been circulated by officers or employees of Seagate to prevent him from becoming employed[.]"  *Id.* (emphasis added).

In comparison, the Second Amended Complaint contains a more robust set of factual allegations from which this Court can infer Apple unearthed Defendants' diminishing statements and, thus, gleaned the negative implications arising therefrom about Sywula's professional reputation.  Unlike Dr. Shukh, who alleged prospective employees learned of his negative reputation based upon his *belief* that "rumors" about his negative reputation had spread beyond Seagate to other companies, *see Shukh* Compl. ¶ 259, Sywula alleges

Defendants' diminishing statements are posited in publicly available court filings, which would be captured by an internet search designed to vet an applicant's online presence. (SAC ¶ 90).  Furthermore, Sywula alleges Apple informed him it had conducted such a search in connection with its vetting process and reneged its offer after doing so.  (*Id.* ¶ 93.)  These allegations provide a sufficiently firm basis for this Court to infer Apple plausibly could have uncovered Defendants' diminishing statements in its background check of Sywula.

### iii.    Redressability

Teleport again argues Sywula's reputational injury is not redressable because the economic component of that injury—losing the Apple job offer—cannot be ameliorated by a favorable ruling.  For the reasons already stated above, *see supra* Sec. III.D.2.iii, this argument is incongruent with *Shukh*.  It is true this Court cannot compel Apple to reinstate its offer to Sywula.  But a favorable ruling on Sywula's § 256 claim plausibly can improve his employment prospects because awarding Sywula inventorship credit could change Sywula's reputation as a software engineer who seeks inventorship credit for inventions he did not actually create "to that of an inventor wronged by his employer, properly seeking credit for his work." *Shukh*, 803 F.3d at 666.  Simply put, a favorable § 256 ruling would lift the stigma associated with Defendants' diminishing statements and this inventorship action that otherwise might befall Sywula in the eyes of prospective employers. Accordingly, Sywula has adequately alleged his injuries are redressable.

\*        \*        \*        \*

Having determined Teleport's facial challenge to standing falls short in its entirety, this Court proceeds to Teleport's factual challenge.  However, it first pauses to address an argument Teleport did not explicitly raise but nevertheless deserves attention.  Ordinarily, where the independent decision of a third party has a significant effect on the plaintiff's injuries, the causal chain is too weak to support standing at the pleading stage. *Allen*, 468 U.S. at 759.  Here, Defendants had no role in deciding whether to promote Sywula to

- 42 -

Principal Engineer—that decision was left to Intel's discretion. And Defendants did not renege Sywula's Build Integration and Firmware Engineer offer— Apple did.

Still, the causal links between Defendants' conduct and Sywula's standing injuries remain intact. Defendants allegedly are directly responsible for inflicting the reputational harms upon Sywula, out of which the alleged injuries flow. Once again, *Shukh* is instructive. Dr. Shukh claimed that he could not obtain employment at peer companies following his termination from Seagate because of the negative reputation Seagate had castigated upon him. Seagate did not choose for those peer companies to reject Dr. Shukh; the companies chose for themselves. Yet Dr. Shukh still adequately demonstrated a causal link between Seagate's conduct and his economic injury because he was able to show his inability to find employment stemmed from Seagate's conduct that had diminished his professional reputation. Sywula has alleged substantially similar circumstances here. Defendants' purportedly wrongful withholding of inventorship credit, and their subsequent diminishing statements, polluted the mix of considerations Intel and Apple plausibly would examine in deciding whether to promote or hire Sywula, respectively. Indeed, the Second Amended Complaint alleges the reputational harm inflicted by Defendants was, in fact, dispositive in bringing about the economic consequences attendant to Intel's and Apple's decisions. Accordingly, Intel's discretion and Apple's decision do not break that chain of causation. *Cf. Parsons v. U.S. Dep't of Just.*, 801 F.3d 701, 714 ("In the nebulous land of 'fairly traceable,' where causation means more than speculative but less than but-for, the allegation of a defendant's conduct was a motivating factor in the third party's injurious actions satisfies the requisite standard.").

### 3.    Factual Challenge

In addition to its facial challenge, Teleport also advances several factual challenges to standing, which are primarily directed at causation. Teleport presents evidence that purportedly severs the causal link between Defendants' conduct and both of Sywula's reputational injuries. Sywula proffers evidence in rebuttal.

21cv1450

Teleport raises a bevy of cursory evidentiary objections to the attestations in the Sywula, Peplinski, Maciej, Ramon, and Park Declarations. (Rule 12(b)(1) Mot. at 19–20.) On a factual challenge to subject matter jurisdiction, courts adopt the same evidentiary standard that governs summary judgment. *Leite v. Crane Co.*, 749 F.3d 1117, 1121–22 (9th Cir. 2014). For a motion for summary judgment, "a party does not necessarily have to produce evidence in a form that would be admissible at trial." *See Block v. City of Los Angeles*, 253 F.3d 410, 418–19 (9th Cir. 2001). "Rule 56(c) requires only that evidence 'would be admissible,' not that it presently be admissible." *Burch v. Regents of Univ. of Cal.*, 433 F. Supp. 2d 1110, 1120 (E.D. Cal. 2006). And while a court will consider a party's evidentiary objections to a motion for summary judgment, "[o]bjections such as lack of foundation, speculation, hearsay and relevance are duplicative of the summary judgment standard itself." *All Star Seed v. Nationwide Agribusiness Ins. Co.*, No. 12CV146 L BLM, 2014 WL 1286561, at *16–17 (S.D. Cal. Mar. 31, 2014) (citing *Burch*, 433 F. Supp. 2d at 1119–20),

Accordingly, unless explicitly mentioned herein, *see infra* Sec. III.D.2.a n. 11–13, many of Teleports objections are subsumed within this Court's application of the summary judgment standard below. To the extent Teleport objects to attestations this Court does not rely upon in reaching its decision here, those objections are denied as moot. *See, e.g.*, *Pauma Band of Luiseno Mission Indians of the Pauma & Yuima Reservation. v. California*, 343 F. Supp. 3d 952, 974 n.3 (S.D. Cal. 2018).

### a.    Loss of Vocational Leverage

Teleport asserts Sywula's loss of vocational leverage has nothing to do with the inventorship issue at the heart of this case. <u>First</u>, Teleport avers that despite Sywula's allegations otherwise, he truly had no interest at advancing or even remaining long-term at Intel. (Rule 12(b)(1) Mot. at 5.) In support of this assertion, Teleport proffers three excerpts of electronic communications Sywula sent to DaCosta, the most recent one being approximately two years before Sywula commenced this action and approximately three years before Sywula began exploring the Principal Engineer opportunity:

- 44 -

- An instant message, dated June 19, 2018, in which Sywula states, "good as usual, I'm pissed at Intel I want to be on my own." (Ex. 4 to DaCosta Decl., ECF No. 65-2.)

- An email, dated February 23, 2019, about putting together a "Teleport team deck" and business cards, in which Sywula lists one of the "[p]otential implications" of doing so is "losing a job," which he states would be "relatively fine with me." (Ex. 5 to DaCosta Decl.)

- An instant message dated November 16, 2016, in which Sywula states "that means in 6 months I can dump Intel." (Ex. 6 to DaCosta Decl.)[10]

In response, Sywula, himself, attests that his "goal was to be promoted to a Principal Engineer [] role at Intel, where [he] had been working for more than 10 years," and that "[i]n early 2022, . . . [he] started exploring avenues towards advancement to [that position]." (Sywula Decl. ¶¶ 4, 7.)[11] He further attests he took affirmative steps to gather more information about the process of seeking a promotion to Principal Engineer and to determine his prospects for such a promotion by consulting with Maciej Peplinski, a "software engineering manager" at Intel, who is "responsible for managing a team [of Software Engineers] and making hiring decisions." (Id. ¶ 8; Peplinski Decl. ¶¶ 2–3, 8–12.)[12] However, Sywula did not apply based on the advice he received from Peplinski, who opined his lack of inventorship made his promotion at Intel unlikely. (Sywula Decl.

---

[10] All exhibits to the DaCosta Declaration are annexed at ECF No. 65-2.

[11] Teleport objects to Paragraph 4 of the Sywula Declaration, in which he attests he began "exploring avenues towards career advancement to Principal Engineer" as "irrelevant." (Rule 12(b)(1) Mot. at 19.) This Court disagrees; that attestation bears directly upon Teleport's contention Sywula had no desire to advance his career at Intel and, thus, upon the issue of Article III standing. Teleport further objects to Paragraph 7 of the Sywula Declaration, in which he attests it was his "goal" to become a Principal Engineer, as "inadmissible hearsay" and "speculation." (Id.) Neither of these grounds for exclusion are applicable to the statements at which Teleport's objections are directed.

[12] Teleport objects to Paragraph 8 of the Sywula Declaration, in which he attests Peplinski advised him not to apply to the Principal Engineer position at Intel, as "inadmissible hearsay." (Rule 12(b)(1) Mot. at 19.) But Sywula has proffered evidence from Peplinski, the declarant herself, in the form of a declaration in which she attests she advised Sywula not to apply for a promotion at Intel due to his lack of patent publications. (See Peplinski Decl. ¶¶ 2–3.) By doing so, Sywula has cured any perceptible hearsay issue at this stage.

¶ 8; Peplinski Decl. ¶¶ 8–11, ¶ 12 ("Knowing the negative rumors and lack of his inventorship credit, I advised [Sywula] to seek a job outside of Intel since I did not believe he would be able to advance to [the] Principal Engineer role at Intel.").)

The Court finds Sywula has submitted ample evidence to create a genuine dispute of fact concerning his intent to advance his career at Intel. The Court finds Sywula's recent sworn testimony to be more indicative of Sywula's aspirations in early 2022 than the electronic communications proffered by Teleport, the most recent of which pre-dates Sywula's job search by approximately three years. The Court further finds the electronic communications Teleport proffers to be of little evidentiary value because they consist of mere single-line excerpts of Sywula's messages to DaCosta, which clearly omit the surrounding conversation that could potentially provide additional context. (*See* Exs. 4–6, DaCosta Decl.) Finally, the Court finds Sywula has presented evidence that adequately rebuts the notion raised by Teleport's evidence that he chose not to apply for a promotion because he did not wish to remain at Intel. Sywula shows that he consulted colleagues with experience hiring software developers and apply to software-developer positions, including a colleague at Intel responsible for making hiring decisions, Peplinski, who advised Sywula he stood no chance of being promoted by Intel.[13]

<u>Second</u>, Teleport argues Intel's unwillingness to promote Sywula to a higher-ranking position and Apple's revocation of its job offer both are "[m]ore likely" attributable to "Sywula's own behavior"—not to any reputational injury allegedly inflicted by Defendants. (Rule 12(b)(1) Mot. at 1; *see also id.* at 14 ("Sywula has done much to tarnish his own reputation and little to advance his own career at Intel.").) Teleport submits evidence it avers supports multiple other causes of Sywula's loss of vocational leverage at

---

[13] Teleport argues that Peplinski's opinion Intel would not promote Sywula should not be relied upon as expert evidence regarding the strength of Sywula's candidacy as a Principal Engineer or construed as a legal opinion. (Rule 12(b)(1) Mot. at 9 n.5, 19.) But this Court does not consider Peplinski's attestations for that purpose. Rather, it merely attaches weight to those attestations for the purpose of deciphering whether Sywula's decision to forego an application for Principal Engineer should be construed as his lack of interest in advancing his career at Intel.

Intel:  it demonstrates Intel investigated Sywula in 2019 because his work for another side venture, Neural HD, presented "a conflict of interest" (Ex. 2 to DaCosta Decl.); it shows that Sywula had taken an "ergonomic chair" belonging to Intel and brought it to Teleport's office space (Ex. 3 to DaCosta Decl.); and it proffers Sywula's Intel performance reviews for 2017 and 2018, which show Sywula was repeatedly encouraged to develop new IP but did not do so during his tenure with Intel  (Ex. 3 to Ludwig Decl., ECF No. 72-1).

As explained above, *supra* Sec. III.D.2.a.ii, the problem with Teleport's argument is that Sywula "need not eliminate any other contributing causes to establish [his] standing." *See  Barnum Timber*, 633 F.3d at 901.  The Ninth Circuit has instructed the "Article III causation threshold" is "less rigorous" than proximate causation.  *Canyon Cty. v. Syngenta Seeds, Inc.*, 519 F.3d 969, 974 n.7 (9th Cir. 2008); *see also Rothstein v. UBS AG*, 708 F.3d 82, 92 (2d Cir. 2013) ("[T]he test for whether a complaint shows the 'fairly traceable' element of Article III standing imposes a lower standard than proximate cause.").  Sywula need not demonstrate that Defendants were the "sole source of" his injury.  *Barnum Timber*, 633 F.3d at 901. Rather, he must only "establish a line of causation' between [D]efendants' action and [his] alleged harm that is more than 'attenuated.'" *See Maya*, 658 F.3d at 1070.  In this regard, Teleport's evidence is not directed at the well-pleaded allegations in the Second Amended Complaint from which this Court can reasonably infer Teleport's omission at least contributed to Sywula's loss of vocational leverage.  All Teleport's evidence does is suggest there are other factors that may have also weakened Sywula's candidacy for the Principal Engineer position.

Finally, Teleport offers a declaration from Jonathan Bendor, a professional software developer it retained to provide an opinion in this matter, in which Bendor attests the impact of Sywula's lack of inventorship credit had on his promotion prospects was negligible. (Bendor Decl. ¶¶ 1, 8, ECF No. 65-4.)  Bendor states, "The practical value for hiring decisions of being named as an inventor or co-inventor is *negligible* when compared to the education and relevant hands-on experience[]" of a candidate, and that he "ha[s] never encountered a situation where inventorship made any difference in the final hiring

decision." (*Id.* ¶ 10(b).)  Bendor did not attest he reviewed any Intel hiring guidelines in reaching this opinion.  Nor does Bendor have experience working at Intel.

In response, Sywula offers the declaration of Matthew Strebe, who is also an experienced software engineer and an inventor.  (Strebe Decl. ¶¶ 9–10, ECF No. 70-1.) Conversely, he opines, "[T]he credibility denoted to inventors with software patents is very important within the hierarchy of corporate career development" and that "[b]eing listed as an inventor on software patents brings opportunities for employment and advancement within that employment, beyond those opportunities available to non-inventors." (*Id.* ¶¶ 17–18.)  He further opines that inventorship credit is particularly important for a software developer who, like Sywula, holds a "degree issued by a foreign, lesser-known university[y] without accreditation in the United States." (*Id.* ¶ 16.)  For these software developers, Strebe attests, obtaining a Principal Engineer role is an especially uphill battle. (*Id.* (attesting Sywula "face[s] severe difficulties in seeking senior positions in employment" in the United States because he was educated in Poland).)  Moreover, Sywula proffers two internal Intel documents that delineate the relevant considerations for hiring and promoting candidates to Principal Engineer:  the Intel Nomination Form and Presentation.   These documents reflect Intel considers patent-inventorship credit as relevant to several qualities it looks for in Principal Engineers.

Viewing the disputed facts in the light most favorable to Sywula as it must, the Court finds the competing affidavits and the Intel files create a genuine dispute of fact concerning the significance Sywula's lack of inventorship credit played in weakening his candidacy for promotion within Intel.  In so finding, the Court is guided by the Federal Circuit's own observation in *Chou*, which it reaffirmed in *Shukh*, that "being considered an inventor of important subject matter is a mark of success" from which "[p]ecuniary consequences may well flow." *Shukh*, 803 F.3d at 663 (quoting *Chou*, 254 F.3d at 1359).[14]

---

[14] *Shukh* holds the importance of patent-inventorship is heightened when the claimed invention is relevant to the field of work in which the putative inventor is employed.  803 F.3d at 663.  Teleport has neither argued nor shown the inventions claimed by the Teleport patents are irrelevant to Sywula's field

### b.  Apple's Rescinded Job Offer

Again, Teleport asserts that reasons having nothing to do with Defendants' conduct were the cause of Apple's decision to renege its job offer to Sywula.  (Rule 12(b)(1) Mot. at 17 ("[T]here are multiple other, more probable reasons for why a prominent, cutting-edge technology company such as Apple might cho[o]se not to hire Sywula, not least of which is his behavior[.]").)  Teleport points to the reputational harm Sywula purportedly inflicted onto himself by taking Teleport's trade secrets when he left the Company.  (Rule 12(b)(1) Mot. at 1.)  Specifically, Sywula attested in a publicly available declaration filed in the Northern District Action that he "cop[ied]/download[ed]" without permission Teleport's files "relating to the work [he] performed [for Teleport] and [his] status as an inventor of the patented materials."  (Ex. 3 ¶ 8 to Ludwig Decl., ECF No. 65-3.)  As a result, the Northern District Action Court ordered Sywula to preserve as evidence the files he had taken.  Northern District Action, ECF No. 30.  Teleport also points to Sywula's self-inflicted reputational harm stemming from a publicly available civil harassment restraining order a California State court issued against him in approximately February 2021, which prohibited Sywula from coming within 300 yards of DaCosta until March 23, 2021.  (Ex. 8 to DaCosta Decl.)

Again, this argument is unavailing for the reasons already stated above.  The negative light in which Defendants' diminishing statements painted Sywula need not be the sole cause of Apple's decision to renege its offer.  *Barnum Timber*, 633 F.3d at 901.  The Second Amended Complaint demonstrates it is plausible that reputational injury influenced Apple's decision.  None of the evidence Teleport proffers contests that notion; instead, it offers additional factors that also may have contributed to Sywula's lost

---

of work. Sywula alleges his specific work in the field of software development includes "conception, design, development, implementation and maintenance of complex software systems."  (SAC ¶ 12.) Sywula alleges that he contributed to the Teleport patents by developing the Teleport ride-sharing application's "software technologies."  (*Id.* ¶¶ 20–24 (delineating Sywula's contributions to the Teleport application's software technologies).)  Hence, the Second Amended Complaint contains sufficient factual allegations from which a plausible inference arises the Teleport patents are relevant to Sywula's work as a software engineer.

opportunity.  At this relatively early stage of the case, neither party should be expected to know, let alone proffer evidence tending to show, precisely the grounds upon which Apple rescinded its offer.  The answer to that question—presumably known only to Apple— inevitably will reveal itself during fact discovery.

## IV.    CONCLUSION

For the foregoing reasons, the Court **DENIES** Teleport's Motion to Strike, **GRANTS** Sywula's Sealing Motion, and **DENIES** Teleport's Rule 12(b)(1) Motion to dismiss this action for lack of standing.  The Court further **ORDERS** Defendants to file an Answer to the Second Amended Complaint **by no later than February 13, 2023**.

The Clerk of Court is directed to accept and file under seal the proposed sealed lodged documents.  (ECF No. 58.)

**IT IS SO ORDERED.**

**DATED: January 23. 2023**

Hon. Cynthia Bashant
United States District Judge

21cv1450