1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

KRZYSZTOF SYWULA,

                            Plaintiff,

     v.

TELEPORT MOBILITY, INC., et al.,

                        Defendants.

Case No. 21-cv-01450-BAS-SBC

**ORDER**

**(1) GRANTING MOTION TO COMPEL ARBITRATION; and**

**(2) STAYING ACTION**

**(ECF No. 80)**

       Pending before the Court is Defendant Teleport Mobility, Inc. ("Teleport")'s motion to compel arbitration of this patent-inventorship action ("Inventorship Action"). (Mot., ECF No. 80.) It is joined by its co-Defendants, Alexis DaCosta ("DaCosta") and Vincent Coletti ("Coletti"). (Not. of Joinder, ECF No. 81.) Plaintiff Krzysztof Sywula ("Sywula") opposes (Opp'n, ECF No. 84) and Teleport replies (Reply, ECF No. 86.) The Court finds Teleport's Motion suitable for resolution without the need for oral argument. *See* Civ. L. R. 7.1(d)(1). For the reasons stated below, the Court **GRANTS** the Motion and **STAYS** this case pending arbitration.

//

//

# I.      BACKGROUND

By now, this Court is well versed in the facts that gave rise to the web of disputes pending between the parties, including this Inventorship Action.  (*See* ECF Nos. 27, 35, 54, 76.)  Therefore, this Court repeats only those facts and pieces of procedural history that are necessary to frame the issues presented by the instant Motion.

## A.      The Mobile Application Venture

In 2016, DaCosta and Coletti had the idea to develop a ride-share aggregator that would enable users to compare the prices of app-based taxi services on their mobile phones. (Order Dismissing First Amended Complaint ("Dismissal Order") at 2:7-12, ECF No. 54.) They teamed up with Sywula, a software developer, to help design and create the application's code and to aid in drafting patent applications—tasks Sywula took upon himself as a side gig to his full-time job as an engineer at Intel.  (*See id.*)  Sywula, DaCosta, and Coletti formalized their arrangement in August 2016 when they entered into their Consulting Agreement.  (*See id.* at 2:13-23.)  The Consulting Agreement provides that, in exchange for his services, Sywula would be given equity in the entity DaCosta and Coletti planned to establish to own the venture's intellectual property.  (*See id.* at 2:21-23.)  The Consulting Agreement does not contain an arbitration provision.  (*See* Consulting Agreement, ECF No. 25-10.)

In November 2018, Sywula, DaCosta, and Coletti entered the Xelerate Partnership Agreement ("XPA").[1]  (XPA, Ex. 4 to Decl. of Frederic G. Ludwig, Esq. ("First Ludwig Decl.), ECF No. 80-2.)[2]  The XPA established a partnership for the purpose of "develop[ing] and sell[ing] or monetiz[ing] intellectual property," defined in the XPA as United States Patent and Trademark Office ("USPTO") utility application numbers "20180053136 [and] 20180053423" (collectively, "Xelerate IP").  (*See id.* § 3.)  In the

---

[1] The XPA is dated April 7, 2018, but the parties did not sign the XPA until November 2018.  (*See* XPA at pp. 1, 20.)

[2] All exhibits to the First Ludwig Declaration are annexed at ECF No. 80-2.

21cv01450

same section in which it sets out the purpose of Xelerate and defines Xelerate IP, the XPA also states:

> [A]ny new or further intellectual property developed by any individual partners related to [the Xelerate IP] will not be restricted by this [XPA] and may be governed by another contract.   Any new or further intellectual property developed by an individual partner . . . includes, but is not limited to continuation patent(s), continuation-in-part (CIP) patent(s), divisional patent(s), utility application(s), provisional application(s), PCT(s), or any relevant patent(s) or any relevant application(s) related to the intellectual property described in this Partnership Agreement.

(*Id.* (alterations added).)

Section 19 of the XPA (the "Arbitration Provision") states:

> Any controversy or claim arising out of or relating to this Agreement, or the breach thereof, shall be settled by arbitration administered by the Judicial Arbitration and Mediation Service (JAMS) in accordance with its Commercial Arbitration Rules.   The arbitration hearing shall take place in San Diego[,] California before a single arbitrator.   Judgment on the award rendered by the arbitrator may be entered in any court having jurisdiction thereof.

(*Id.*)

Over time, the business arrangement between Sywula, DaCosta, and Coletti evolved, both in corporate structure and name.   Eventually, Sywula and DaCosta formed Teleport to own and develop the ride-share mobile application.   (*See* Dismissal Order at 3:3-9.) Sywula became Teleport's Chief Technology Officer and obtained a large minority stake in the company.   (*See id.*)   In that position, Sywula avers he continued to develop the application's software and technology and to draft related patent applications.   (*See id.*) DaCosta is a director on Teleport's board and its majority shareholder.   (*See id.*)   Coletti allegedly works alongside DaCosta to control the entity.   (*See id.*)   Sywula also entered into Teleport's Employee Proprietary Information and Inventions Agreement ("Inventions Agreement"), under which he, in essence, promised to assign practically everything he developed with Teleport to the entity. (*See* Inventions Agreement §§ 2.2–2.3, ECF No. 14-

21cv01450

3; Dismissal Order at 3–4.)  The Inventions Agreement does not contain an arbitration provision.  (*See generally* Inventions Agreement.)

Sywula avers that between 2016 and 2020, he developed the source code and algorithms for the venture's software and wrote 25 domestic and international patent applications claiming that technology.  (Second Am. Compl. ¶ 25, ECF No. 59.)  Several of those applications matured into the five patents-in-suit:  U.S. Patent Nos. 11,087,250 ("'250"), 11,087,252 ("'252"), 11,087,253 ("'253"), 11,176,500 ("'500"), 11,182,709 ("'709" and, collectively, the "Subject Patents").  Despite his contributions, DaCosta and Coletti purportedly omitted Sywula's status as an inventor in the applications.  (*See, e.g.*, *id.* ¶ 58.)  Thus, when the USPTO issued the Subject Patents, it did so without crediting Sywula as an inventor.  (*Id.*)

In approximately 2020, the business relationship between Sywula, DaCosta, and Coletti devolved and litigation ensued.

## B.    The Northern District Action

Teleport, and its subsidiary Northern Lights, struck first in February 2021.  (*See* Northern District Action Compl., Ex. A to First Ludwig Decl.)  They filed suit in the Northern District of California alleging, *inter alia*, that Sywula breached several agreements, including the Consulting Agreement, the Inventions Agreement, and the XPA, and that Sywula had misappropriated Teleport's intellectual property.  (*See id.* ¶¶ 63–68 (alleging breach of contract); *id.* ¶¶ 69–79, 92–99 (alleging misappropriation of intellectual property).)  Teleport and Northern Lights also pressed a claim for declaratory relief.  (*See id.* ¶¶ 127–33.)   In particular, they sought a declaratory judgment recognizing that "DaCosta and Coletti, and not Sywula, are the joint inventors of the inventions claimed in United States Patent Application Nos. 16/222,817; 15/680,439, 16/038,487; 15/675,757; 62/539,706;  62/482,306;  62/426,549;  62/375,491;  and/or  17,124,833;  and  PCT Application Nos. PCT/US18/043363 and PCT/US18/043359[.]"  (*Id.* ¶ 128(a).)

On April 23, 2021, Sywula moved to compel the Northern District Action, in its entirety, to arbitration.  (Sywula's Mot. to Compel, Ex. 2 to First Ludwig Decl.)  Teleport

21cv01450

and Northern Lights opposed.  On June 4, 2021, United States District Judge Susan Illston compelled the Northern District Action to arbitration.  (Judge Illston's Arbitration Order, Ex. 3 to First Ludwig Decl.)  Judge Illston first assessed whether the XPA constitutes "an agreement to arbitrate between the parties." (*Id.* at 3:14 (quoting *Brennan v. Opus Bank*, 796 F.3d 1125, 1130 (9th Cir. 2015)).)  Although neither Teleport nor Northern Lights is a signatory to the XPA, she answered that question affirmatively.  Judge Illston reasoned that Teleport and Northern Lights had "knowingly exploited" the XPA by pressing claims thereunder against Sywula and, thus, that California law of equitable estoppel requires Teleport and Northern Lights to be treated as parties to the XPA, including the contract to arbitrate located at Section 19 therein.  (*See id.* at 4:8-19 (citing, *inter alia*, *Knutson v. Sirius XM Radio Inc.*, 771 F.3d 559, 565 (9th Cir. 2014)).)  Judge Illston found equitable estoppel particularly apposite under the circumstances, considering that DaCosta—Teleport's director and majority shareholder—signed the XPA.  (*See id.* at 5:4-7 ("Equitable estoppel typically applies to third parties who benefit from an agreement made between two primary parties." (quoting *Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1179 (9th Cir. 2014))).)

Having discerned a valid agreement to arbitrate between the parties to the Northern District Action, Judge Illston next addressed arbitrability of the disputes at issue.  Arbitrability, she concluded, had been clearly and unmistakably delegated to the arbitrator through the XPA's incorporation by reference of JAMS Commercial Arbitration Rule 11.  (*See* Judge Illston's Arbitration Order at 6:9-10, 6:15-21.)  Accordingly, Judge Illston did not analyze whether each of Teleport and Northern Light's claims are covered by the XPA.  She did not, for example, assess the closeness of the relationship between the patent applications identified in the declaratory relief claim, on the one hand, and the Xelerate IP, on the other hand.  Instead, Judge Illston swiftly compelled the Northern District Action to arbitration, finding it is for the arbitrator—not the court—to determine whether Teleport and Northern Light's claims are covered by the XPA.  (*See id.*)

//

### C.     The Rescission Action

One month after the Northern District Action commenced, Sywula filed in March 2022 an action in San Diego County Superior Court against not only Teleport and Northern Lights but also DaCosta and Coletti. *See Sywula v. DaCosta*, No. 21-cv-01456-BAS-AGS, 2022 WL 910217, at *2–3 (S.D. Cal. Mar. 29, 2022) ("Remand Order") (resolving motion to remand). His initial state court complaint raised seventeen claims, including for breach of the Inventions Agreement, rescission of the Inventions Agreement, conversion, failure to pay wages, and declaratory relief. *Id.* at *2.

Teleport and Northern Lights removed the Rescission Action pursuant to 28 U.S.C. § 1331 on the ground that Sywula's claim for declaratory relief concerned a federal issue: inventorship of patents. Remand Order at *3. In response, Sywula filed a First Amended Complaint that overhauled his declaratory relief claim to expressly seek relief based on rescission of the Inventions Agreement—a matter governed by state law—and to delete reference to patent-inventorship issues. *Id.* Sywula then renewed his motion to remand, which this Court granted. *Id.* The Court found that no federal issue arose from the new pleading, and that no ground existed to justify retention of supplemental jurisdiction over Sywula's medley of state law claims. Accordingly, it remanded the Rescission Action to state court. *Id.* at *10–11.

Upon remand, Teleport and Northern Lights moved to compel arbitration of the Rescission Action and to consolidate such arbitration with the arbitration proceedings for the Northern District Action. ((Rescission Action Minute Order, Ex. 6 to First Ludwig Decl.) The state court granted that motion. (*Id.*)

### D.     This Inventorship Action

In August 2021, Sywula filed Inventorship Action, raising a single claim for correction of patent inventorship under 35 U.S.C. § 256. (Compl., ECF No. 1.) At first, Sywula sought correction only of the '250, '252, and '253 Patents. (*See id.* ¶ 6.) However, Sywula later amended the action to include the '500 and '709 Patents. (*See* SAC ¶ 6.)

For nearly a year, Sywula failed to demonstrate standing to pursue his § 256 claim. The Court first denied Sywula's application for a temporary restraining order and preliminary injunction, reasoning the initial Complaint failed to allege Sywula had standing under any of the three viable theories within the patent-inventorship context. (Order Denying TRO, ECF No. 27); *see Fina Oil & Chem. Co. v. Ewen*, 123 F.3d 1466, 1470 (Fed. Cir. 1997) (recognizing that a putative inventor with an ownership interest in the patent in question has standing to pursue a § 256 claim); *Chou v. Univ. of Chi.*, 254 F.3d 1347, 1359 (Fed. Cir. 2001) (recognizing that a putative inventor with a financial interest in inventorship credit of a patent has standing to pursue a § 256 claim); *Shukh v. Seagate Tech., LLC*, 803 F.3d 659, 663 (Fed. Cir. 2015) (recognizing that a putative inventor who suffers a "concrete and particularized reputational injury" from the withholding of inventorship credit of a patent has standing to pursue a § 256 claim).

Sywula filed his First Amended Complaint on September 29, 2021, seeking to bolster his claim that DaCosta and Coletti's failure to credit him as a co-inventor caused him reputational harm sufficient to invoke standing pursuant to *Shukh*, 803 F.3d at 659. (*See* First Am. Compl. ("FAC"), ECF No. 15.) Teleport filed a motion to dismiss the First Amended Complaint for lack of standing under Federal Rule of Civil Procedure ("Rule") 12(b)(1) (*see* ECF No. 25), which the Court granted in July 2022 (*see* Dismissal Order). In its Dismissal Order, the Court determined Sywula still failed to demonstrate he had suffered a *concrete* reputational injury as a prerequisite of standing under *Shukh*. (Dismissal Order at 10:10–12:26.) However, the Court granted Sywula an opportunity to revise his reputational-standing allegations. (*Id.* at 13:7-8.)

On August 11, 2022—almost a year after he initiated this action—Sywula filed his Second Amended Complaint. (*See* SAC.) This new pleading contained supplemental allegations, which spell out with greater detail the pecuniary nature of the reputational harm Sywula allegedly suffered due to DaCosta and Coletti's omission of his inventor status. (*See* SAC ¶¶ 83–98.) These supplemental allegations sufficed. On January 23, 2023, this Court concluded Sywula has standing under *Shukh* and, thus, denied Teleport's motion to

dismiss the Second Amended Complaint for lack of standing.  (*See generally* Order Denying Third MTD.)

E.     **The Pending Arbitration**

Teleport initiated arbitration proceedings in June 2021 following Judge Illston's Arbitration Order.  *See Teleport Mobility, Inc. v. Sywula*, JAMS Case No. 1240024720 (the "Arbitration").  Teleport's Arbitration Demand  essentially mirrors the claims raised in the Northern District Action, including Teleport's claim for declaratory relief concerning patent inventorship.  (Teleport's Arbitration Demand ¶ 115(a), Ex. 7 to First Ludwig Decl.) Shortly thereafter, Sywula's Rescission Action claims were added.  (*See generally* Arbitrator Cannon's Denial, Ex. 9 to First Ludwig Decl.)

In December 2022, Sywula moved to dismiss the addition of his Rescission Action claims on the ground that, *inter alia*, those claims do not allege breach of the XPA, nor do they arise from or relate to the XPA in any sense.  (*See* Sywula's Mot. to Dismiss the Arbitration at 14–18.), Ex. 8 to First Ludwig Decl.)  Sywula argued, in essence, that only two of his claims alleged breach of contract and that those breach of contract claims arose from the Inventorship Agreement—not the XPA.  (*Id.*)  Arbitrator Judge Jonathan Cannon (Ret.) ("Arbitrator Cannon") summarily denied Sywula's motion on January 9, 2023 for the reasons provided by Teleport in its opposition, which neither party proffers to this Court.  (Arbitrator Cannon's Denial.)

**II.    LEGAL STANDARD**

The Federal Arbitration Act ("FAA") applies to arbitration agreements in any contract affecting interstate commerce.  *See* 9 U.S.C. § 2; *see also Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 119 (2001).  Under the FAA, agreements to arbitrate "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract."  9 U.S.C. § 2.  Ensconced in the FAA and the decisional law arising therefrom is a "liberal federal policy favoring arbitration" and the "fundamental principle that arbitration is a matter of contract."  *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011) (internal citations omitted).

- 8 -

A party to an arbitration agreement may bring a motion in federal district court to compel arbitration in accordance with the terms of the agreement.  *See* 9 U.S.C. § 4.  In deciding whether to compel arbitration, a court generally must determine two threshold issues of arbitrability:  (1) whether there is a valid agreement to arbitrate and (2) whether the agreement encompasses the  dispute at issue.  *See Brennan v. Opus Bank*, 796 F.3d 1125, 1130 (9th Cir. 2015).  If there is a valid agreement to arbitrate, and that agreement covers the dispute, the court must compel arbitration.  *See Lifescan, Inc. v. Premier Diabetic Servs., Inc.*, 363 F.3d 1010, 1012 (9th Cir. 2004).

Threshold issues of arbitrability are presumptively for the district court to decide. *See Martin v. Yasuda*, 829 F.3d 1118, 1122–23 (9th Cir. 2016) (citations omitted). However, parties can delegate the power to decide arbitrability to the arbitrator through "clear and unmistakable" evidence of an agreement to do so.  *Brennan*, 796 F.3d at 1130. In determining whether the parties delegated arbitrability to the arbitrator, the court applies federal arbitrability law "absent clear and unmistakable evidence that the parties agreed to apply non-federal arbitrability law."  *Cape Flattery Ltd. v. Titan Mar., LLC*, 647 F.3d 914, 921 (9th Cir. 2011) (citation omitted).

"[T]he party resisting arbitration bears the burden of proving that the claims at issue are unsuitable for arbitration."  *Green Tree Fin. Corp.-Ala. v. Randolph*, 531 U.S. 79, 91 (2000) (citation omitted).  A court must defer to arbitration "unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute," and "doubts should be resolved in favor of coverage."  *AT&T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 650 (1986).

## III.   ANALYSIS

There is no question the XPA contains a valid arbitration agreement to which the parties are bound.  Instead, Sywula contests the Motion on two other grounds.  First, he argues Teleport waived its right to seek arbitration.  (*See* Opp'n at 3:7–6:14.)  Next, Sywula contends that the XPA's Arbitration Provision does not cover three of the Subject Patents— the '252, '253, and '709 Patents.  Thus, he avers that despite the XPA Provision's

21cv01450

delegation of arbitrability—the validity of which he does not challenge—this Court cannot compel to arbitration Sywula's § 256 claim as to those three Patents.  The Court considers each of Sywula's arguments in turn.

### A.   Waiver

After the Supreme Court's relatively recent decision in *Morgan v. Sundance, Inc.*, 142 S. Ct. 1708 (2022), "the test for waiver of the right to compel arbitration consists of two elements:  (1) knowledge of an existing right to compel; and (2) intentional acts inconsistent with that right."  *Hill v. Xerox Bus. Servs., LLC*, 59 F.4th 457, 468 (9th Cir. 2023) (cleaned up).  A party opposing arbitration need not show prejudice to prevail.  *See Hill*, 59 F.4th at 468.  *Morgan* also changed the waiver standard in another important aspect:  the party opposing arbitration no longer bears a "heavy" burden to overcome some presumption against waiver once ensconced in some courts' interpretations of the federal policy favoring enforcement of arbitration agreements.  *See Armstrong v. Michaels Stores, Inc.*, 59 F.4th 1011, 1015 (9th Cir. 2023) ("No longer is there a 'special' rule favoring arbitration" (quoting *Morgan*, 142 S. Ct. at 1713)).  The party opposing arbitration still has the burden of demonstrating waiver, but courts "must hold a party to its arbitration contract just as the court would to any other kind [of contract]."  *Id.* (quoting *Morgan* 142 S. Ct. at 1713).

Under the newly enunciated standard for waiver set forth in *Morgan*, the Court finds the instant case presents a close call.  But while Sywula demonstrates Defendants knew of their right to arbitrate under the XPA, he fails to demonstrate Defendants' intentional acts inconsistent with that right for the reasons stated below.

### 1.   Defendants Knew of Their Existing Right to Arbitrate

That Sywula has satisfied the first requirement of waiver is neither seriously disputed by Defendants nor in doubt.  The record—indeed, the documents proffered by Teleport alongside its Motion—demonstrates that all three Defendants can pinpoint the moment at which they attained knowledge of their right to arbitrate under the XPA to a time *before* Sywula's commencement of this Inventorship Action.

21cv01450

The Court infers that DaCosta and Coletti were aware of the XPA's Arbitration Provision in 2018. Those Defendants (1) drafted the XPA in April 2018 and (2) signed and entered the XPA several months later in November 2018. (*See* Northern District Action Compl. ¶ 23 ("Nearly two years later, Sywula, DaCosta, and Coletti formed the Xelerate Partnership, pursuant to an April 7, 2018 agreement of the same name[.]"); XPA at pp. 1, 20.) Courts routinely impute a party's knowledge of an existing right to arbitrate when the party is both a drafter and signatory of the contract containing an arbitration clause. *See, e.g., Hoffman Const. Co. of Or. v. Active Erectors & Installers, Inc.*, 969 F.2d 796, 798 (9th Cir. 1992) (finding defendant knew of its right to arbitrate because the contract it had entered and signed "itself called for arbitration of disputes"); *cf. Morgan Stanley & Co., LLC v. Couch*, 134 F. Supp. 3d 1215, 1228 (E.D. Cal. 2015) ("[T]he first *Fisher* prong is satisfied because [defendant] cannot dispute that he signed the Employment Agreement and twice initialed the Arbitration Clause provisions."); *Freaner v. Valle*, 966 F. Supp. 2d 1068, 1085–86 (S.D. Cal. 2013) ("To begin with, it is indisputable that [plaintiff] had knowledge of his purported right to arbitrate. [Plaintiff] drafted the printed contract containing the arbitral clause[.]").

As for Teleport, its knowledge of a right to arbitrate under the XPA is attributable to Judge Illston's Arbitration Order, decided in June 2021. That Order applied the doctrine of equitable estoppel to hold that the XPA is "a valid arbitration agreement" between Sywula and Teleport, despite Teleport's non-signatory status. Judge Illston accordingly compelled all Teleport's claims pressed in the Northern District Action to arbitration pursuant to the terms of the XPA. (*See* Judge Illston's Arbitration Order at 4:20.) Teleport reaffirmed its knowledge of its right to arbitrate under the XPA when it moved to compel the Rescission Action to arbitration under the terms of the XPA in the summer of 2022. (*See* Rescission Action Minute Order.)

//

//

//

21cv01450

### 2.     Defendants did not Engage in Acts Inconsistent with Their Right to Arbitration

It is not enough that Defendants knew they possessed a right to compel arbitration of this Inventorship Action, yet sat idly on those rights for the duration of this litigation. Defendants also must have taken "intentional acts inconsistent" with their rights under the XPA.  *See Newirth by & through Newirth v. Aegis Senior Cmtys., LLC*, 931 F.3d 935, 940 (9th Cir. 2019).

"There is no concrete test to determine whether a party has engaged in acts that are inconsistent with its rights to arbitrate."  *Martin*, 829 F.3d at 1125.  Rather, the Ninth Circuit instructs courts to employ a holistic approach to suss out whether a party's actions "indicate a conscious decision to seek judicial judgment on the merits of the arbitrable claims, which would be inconsistent with a right to arbitrate."  *Newirth*, 931 F.3d at 941 (quoting *Martin*, 829 F.3d at 1125) (cleaned up).   In other words, "a party acts inconsistently with exercising the right to arbitrate when it (1) makes an intentional decision not to move to compel arbitration and (2) actively litigates the merits of a case for a prolonged period of time in order to take advantage of being in court" (the "*Newirth* framework").  *Id.*  A court must "consider the totality of a party's actions" in applying the *Newirth* framework.  *Armstrong*, 59 F.4th at 1015 (quoting *Hill*, 59 F.4th at 471).

Considering the case law, Sywula does not meet the second element of the *Newirth* framework.  The Opposition understandably places considerable emphasis on the duration of Teleport's delay in bringing its Motion.  (Opp'n at 2:13-17 ("Defendants are not entitled to arbitration because they have waived such right by acting consistently with the intent to litigate and waiting until February 2023, eighteen months after this case was filed in August 2021, to formally request for arbitration."); *see also id.* at 4:24–27, 5:3-5.)  Approximately 18 months lapsed between the commencement of this case and Defendants' invocation of their arbitral rights under the XPA.  To be sure, 18 months certainly is a protracted delay, which falls well within the duration other courts have found to support a finding of waiver.  *See, e.g.*, *Martin*, 829 F.3d at 1126 (finding waiver where movants spent "17 months

- 12 -

litigating the case"). But the length of delay is just one factor that gives color to the totality of Defendants' conduct throughout the Inventorship Action and to whether Defendants' acts were inconsistent with their known rights under the XPA. *See, e.g.*, *Grigsby & Assocs., Inc. v. M Sec. Inv.*, 635 F. App'x 728, 733 (11th Cir. 2015) ("Although delay is undoubtedly a factor to be considered, in our precedent where waiver was found, the delay was always coupled with other substantial conduct inconsistent with an intent to arbitrate."); *cf. Martin*, 829 F.3d at 1126 (finding waiver based upon 17 month delay *coupled with* movant's "considerable time and effort [spent working on] a joint stipulation structuring the litigation, filing a motion to dismiss on a key merits issue, entering into a protective order, answering discovery, and preparing for and conducting a deposition" (quotation marks and footnote omitted)).

"In practical terms, this means [Sywula] must show something more than mere delay[.]" *Lobster 207, LLC v. Pettegrow*, 1:19-CV-0552-LEW, 2020 WL 2839287, at *9 (D. Me. June 1, 2020). Sywula bears a burden to establish that, while Defendants sat idly upon their right to arbitrate, they undertook a "conscious decision . . . to seek judicial judgment on the merits of [the] arbitrable claims." *See Martin*, 829 F.3d at 1124–25. Even under the new, post-*Morgan* landscape, in which "there is no longer a thumb on the scale in favor of arbitration," Sywula fails to demonstrate this "something more." *See Armstrong*, 59 F.4th at 1016.

Sywula claims Defendants acted inconsistently with their known right to arbitrate by (1) seeking transfer of venue to the Northern District Action (*see* Opp'n at 3:20-21), (2) moving to dismiss the Inventorship Action three times (*see id.* at 5:8-10 & n.2), and (3) partaking in discovery (*see id.* at 3:23–4:12). But when examined more closely, none of these acts—on their own or in the aggregate—indicate Defendants' active litigation in pursuit of a decision on the merits of Sywula's § 256 claim by this Court. *See, e.g.*, *Martin*, 829 F.3d at 1119 (holding that the second element of waiver is satisfied "when a party chooses to delay his right to compel by actively litigating his case to take advantage of being in federal court"); *Newirth*, 931 F.3d at 941 (surveying Ninth Circuit decisional law,

including *Martin*, 829 F.3d at 1118, and finding that precedent shows "[s]eeking a decision on the merits of a key issue indicates an intentional and strategic decision to take advantage of the judicial forum").

  <u>Motion to Transfer Venue</u>: Defendants twice requested transfer of venue to the Northern District of California. They lodged their first request in their first motion to dismiss, filed on September 1, 2021—approximately three weeks after Sywula commenced this action. (Defs.' First Mot. to Dismiss ("First MTD") at 13:22–20:23, ECF No. 8-1.) Rather than respond to Defendants' First MTD, Sywula amended his pleading. (*See* FAC.) Defendants renewed their request in their second motion to dismiss, filed on October 4, 2021. (Defs.' Second Mot. to Dismiss ("Second MTD") at 16:24–24:3, ECF No. 25-1.) Sywula avers—without citing support—that Defendants' motions to transfer were inconsistent with Defendants' right to arbitrate.

  But this Court's survey of the relevant case law points in the opposite direction. It discloses that a motion to transfer venue, filed in the early stage of proceedings, is not inconsistent with a right to arbitrate. *Cf. Sharif v. Wellness Int'l Network, Ltd.*, 376 F.3d 720, 727 (7th Cir. 2004) (holding a motion to transfer venue does not constitute waiver of the right to arbitrate), *cited approvingly by Murray v. Transp. Media, Inc.*, No. 3:19-cv-180-JR, 2019 WL 7144115, at *5 (D. Or. Oct. 17, 2019) (Report & Recommendation), *adopted by* 2019 WL 7134413, at *1 (Dec. 23, 2019); *see also Palmer v. Omni Hotel Mgmt. Corp.*, No. 15cv1527 JM(MDD), 2016 WL 816017, at *4 (S.D. Cal. Mar. 1, 2016) (finding opposition to motion to transfer venue is not inconsistent with the right to arbitrate). The Court agrees with the implicit conclusion of its sister tribunals that motions to transfer venue do not comprise strong evidence of a party's "conscious decision to seek judicial judgment on the merits of the arbitrable claims." *See Martin*, 829 F.3d at 1125. A motion to transfer venue generally does not bear upon the merits of a cause. And it is particularly weak evidence of the party seeking arbitration's intent to avail itself of a judicial forum where, as here, the venue to which transfer is sought is litigating or has decided

21cv01450

arbitrability.   Therefore, the Court finds this strand of Sywula's waiver argument unavailing.

Defendants' Three Rule 12(b)(1) Motions:   As Sywula points out, Defendants moved thrice to dismiss the Inventorship Action.  (*See generally* First MTD; Second MTD; Defs.' Third Mot. to Dismiss ("Third MTD"), ECF No. 65-1.)  In each instance, Defendants moved on jurisdictional grounds only:   they averred this Court lacked subject matter jurisdiction under Rule 12(b)(1) because Sywula has no standing to sue for correction of the Subject Patents.  (*See* First MTD at 6:14–11:27; Second MTD at 6:24–13:3; Third MTD at 9:9–18:24.)   All three MTDs lodged facial and factual challenges to subject matter jurisdiction.  (First MTD at 7:6-14; Second MTD at 10:3-11; Third MTD at 10:14-16.) This Court did not rule on Defendants' First MTD, for Sywula rendered it moot by filing a First Amended Complaint.  (*See* FAC.)  It granted Defendants' Second MTD, finding Sywula's standing allegations did not adequately demonstrate a reputational injury under *Shukh*.  (*See* Dismissal Order at 10:16-18 ("The Court thus considers Teleport's Rule 12(b)(1) motion as a 'facial attack' on this ground for standing[.]").)  However, it denied Defendants' Third MTD on the basis that Sywula's supplemental standing allegations adequately invoked *Shukh* and the extraneous evidence Sywula proffered adequately rebutted Defendants' factual challenge.  (*See generally* Order Denying Third MTD.) Sywula avers Defendants' MTDs justify waiver.

"[M]oving to dismiss an action on jurisdictional . . . grounds is not inconsistent with a known right to compel arbitration because such motions do not seek a judicial determination on the merits."  *Newirth*, 931 F.3d at 941–42 & n.10 (citing *Martin*, 829 F.3d at 1125–26 & n.4).   Such motions reflect a "determination to avoid or frustrate the litigation," not to "actively litigate."  *See Britton v. Co-op Banking Grp.*, 916 F.2d 1405, 1413 (9th Cir. 1990).

21cv01450

To buttress his waiver argument, Sywula principally cites *Martin*, 829 F.3d at 1118. (*See* Opp'n at 4:24–5:5.)[3]  But *Martin* does not support Sywula's position.  In *Martin*, the moving parties successfully sought dismissal of the action under Rule 12(b)(6) on an issue key to the merits of the underlying claims.  *See Martin*, 829 F.3d at 1122 (describing *Martin* defendant's motion to dismiss as premised upon the argument that plaintiffs' wage-and-hour claims failed because they were not defendant's employees as a matter of law).  The district court concluded the defendant had waived its right to compel arbitration, in part based upon its Rule 12(b)(6) motion.  The Ninth Circuit affirmed, finding the moving parties' Rule 12(b)(6) motion evinced active litigation of the case in pursuit of a judgment on the merits.  *Id.* at 1125.  Defendants' actions in this case are distinguishable.  None of the MTDs sought a determination on the merits of Sywula's § 256 claim; Defendants only ever sought dismissal on jurisdictional grounds—for lack of standing—under Rule 12(b)(1).  In other words, unlike the *Martin* defendant, who sought for the court to weigh in on the merits of the claims pressed against it,  Defendants here have consistently taken the position throughout litigation that this Court does not have authority to decide the merits of Sywula's claim.[4]  *See id.* at 1126–26 & n.4.

---

[3] In addition to *Martin*, Sywula also cites *Kelly v. Public Utility District No. 2*, 552 F. App'x 663, 664 (9th Cir. 2014). (*See* Opp'n at 4:24–5:5.)  In that case, the Ninth Circuit affirmed in an unpublished memorandum disposition the district court's finding that defendants had failed to preserve their right to compel arbitration where they "conducted discovery and litigated motions, including a preliminary injunction and a motion to dismiss." *Kelly*, 552 F. App'x at 664.  A closer examination of the trial court's docket in that cases shows the *Kelly* defendants sought dismissal on jurisdictional grounds under Rule 12(b)(1).  Mot. to Dismiss, *Kelly v. Public Util. Dist. No 2*, 2:11-cv-0023-JLQ (E.D. Wash. filed Apr. 1, 2011), ECF No. 38.

But *Kelly* does not alter this Court's conclusion.  As an initial matter, the Ninth Circuit's "unpublished dispositions . . . are not precedent, except when relevant under the doctrine of law of the cases or rules of claim preclusion or issue preclusion." Fed. R. App. P. 36-3.  Moreover, in its waiver analysis, the *Kelly* Court paid no mind to whether the *Kelly* defendants brought their motion to dismiss under Rule 12(b)(1) or (b)(6).  To the extent *Kelly* can be construed as holding that a challenge to jurisdiction is inconsistent with a known right to arbitrate, the subsequently decided published opinion in *Newirth* forecloses such an interpretation.

[4] The Court does not find Teleport's argument in its Opposition to Sywula's Application for a Temporary Restraining Order ("TRO Opposition") that Sywula is not a co-inventor of the Subject Patents to be strong evidence of waiver.  (*See* TRO Opp'n at 23:13–25:5.)  The TRO Opposition principally contests Sywula lacks standing to bring his § 256 claim and that entertaining this Inventorship Action

21cv01450

Sywula also argues it is material to the waiver analysis that this Court dispatched of the Rule 56 standard—considering and weighing extrinsic evidence—in hearing and rejecting Defendants' facial challenge to subject matter jurisdiction in its Order Denying the Third MTD. (*See* Opp'n at 5:6–6:2 & n.2.) The Court is unmoved. The standard this Court deployed does not alter the grounds upon which the Third MTD sought dismissal: lack of subject matter jurisdiction, and not on the merits of Sywula's inventorship claim.

Because the Rule 12(b)(1) MTDs exhibit an intent to "avoid" litigation of the Inventorship Action, and not to litigate it to resolution in this judicial forum, Sywula fails to demonstrate those MTDs were inconsistent with Defendants' arbitral rights under the XPA.

Discovery:  Finally, Sywula avers Defendants' participation in discovery justifies a determination of waiver. Sywula represents that Defendants served him "with discovery requests in March 2022, requiring [him] to produce thousands of documents," which Sywula did. (Opp'n at 3:23-27 (citing Declaration of Gary Eastman, Esq. ("Eastman Decl.") ¶¶ 8, 10, ECF No. 85).) Defendants also remotely deposed Sywula on September 23, 2022, shortly after filing their Third MTD. (*See* Eastman Decl. ¶ 11.) Defendants contend the discovery they have taken to date is not inconsistent with their request to arbitrate because it has been limited, by agreement, only to the issue of Sywula's standing—namely, whether Sywula suffered concrete reputational harm from DaCosta and Coletti's actions. (Reply at 5:6–11.) In support, Defendants' counsel proffers an email thread between himself and Sywula's counsel, in which the attorneys agreed to "limit" Sywula's deposition "to issues pertaining to reputational harm, reserving substantive topics related to inventorship for a later date, if need be." (Email Thread at 1, Ex. 1 to Declaration of Frederic G. Ludwig, Esq. ("Second Ludwig Decl."), ECF No. 86-1.) They do not,

---

would create duplicative federal litigation; it styles the merits argument in the alternative to those primary assertions. (*See id.* 14:8–23:4.) Furthermore, Defendants did not re-assert in any of their three MTDs the position that Sywula does not qualify as a co-inventor of the Subject Patents under § 256, indicating an intent to preserve the right to arbitration.

21cv01450

however, proffer evidence showing that their document requests and Sywula's subsequent disclosures were similarly circumscribed.  In fact, Defendants' Requests for Interrogatories appear to have been much broader than represented in their Reply and do, indeed, target issues pertaining to the merits, *e.g.*, Sywula's claim his contributions to the Subject Patents deem him an inventor.  (*See* Minute Entry, ECF Nos. 50–51.)[5]

Still, Sywula's argument that Defendants' discovery requests, standing alone, justify warrants waiver is unavailing.  As an initial matter, the Court agrees that, by limiting Sywula's deposition only to issues pertaining to standing, Defendants exhibited a determination to avoid litigation—not to actively litigate the merits of Sywula's § 256 claim.  *See Britton*, 916 F.2d at 1413.  Furthermore, even though Defendants' requests for interrogatories bled into the merits of this case, Sywula has failed to cite any instance in which a court has determined discovery requests alone—however extensive—are so inconsistent with a right to arbitrate that they effect waiver.  *Cf. Hill*, 59 F.4th at 473–74 (finding that defendant's discovery requests, coupled with summary judgment motion, was inconsistent with the agreement to arbitrate).  Indeed, the discovery taken can still be used in the Arbitration, and therefore is not necessarily inconsistent with Defendants' right to arbitrate.  *See Palmer*, 2016 WL 816017, at *12 (finding document discovery and deposition "obviate the need for the same in arbitration proceedings" and, therefore, did not support a finding of waiver)

Accordingly, Sywula does not meet his burden to demonstrate Defendants waived their right to arbitration.  *See Fisher*, 791 F.2d at 694.

## B.   The Parties Clearly and Unmistakably Delegated Arbitrability

Sywula does not contest that the XPA delegates arbitrability to the arbitrator.  Indeed, he advocated in the Northern District Action that the Arbitration Provision contains

---

[5] The Court has listened to the recordings of proceedings held before then-United States Magistrate Judge, now-United States District Judge, Andrew G. Schopler, on May 20, 2022.  It is apparent from that recording that the Request for Interrogatories Defendants served upon Sywula relate to more than just his standing to pursue a § 256 claim.

a valid delegation of arbitrability.  (*See* Sywula's Mot. to Compel at 12:20–13:23 (arguing the Arbitration Provision's incorporation of JAMS Commercial Rule 11 is clear and unmistakable evidence of a contract to delegate arbitrability).)  Still, for the sake of thoroughness and completeness, the Court addresses whether the Arbitration Provision contains a valid  delegation clause.  In line with Judge Illston's Arbitration Order, it answers that question affirmatively.

Defendants aver the Arbitration Provision requires that any dispute pertaining to arbitrability must be submitted to the arbitrator because it "expressly incorporates by reference the JAMS Commercial Arbitration Rules."  (Mot. at 12:3-10; *see* XPA § 19.)  JAMS Commercial Rule 11(c) provides:

> Jurisdictional and arbitrability disputes, including disputes over the formation, existence, validity, interpretation or scope of the agreement under which Arbitration is sought, and who are proper Parties to the Arbitration, shall be submitted to and ruled on by the Arbitrator.  The Arbitrator has the authority to determine jurisdiction and arbitrability issues as a preliminary matter.

(JAMS Commercial Rule 11(c), Ex. 10 to First Ludwig Decl.)

In her Arbitration Order, Judge Illston held that the XPA's incorporation of Rule 11(c) evinced "clear and unmistakable evidence that arbitrability was delegated to the arbitrator." (Judge Illston's Arbitration Order at 5:9-10.)  She found particularly relevant that, in the context of another arbitrator, the Ninth Circuit has held that "incorporation of the AAA rules constitutes clear and unmistakable evidence that the contracting parties agreed to arbitrate arbitrability."  *See Brennan*, 796 F.3d at 1130; (*see* Judge Illston's Arbitration Order at 6:9-28.)  This Court agrees with Judge Illston and adopts her arbitrability determination as if it were this Court's own.   Accordingly, the Court finds that the parties have clearly and unmistakably delegated the question of arbitrability.

## C.   Sywula's Remaining Argument is Unavailing

Having found there is a valid agreement to arbitrate between the parties, and that yet another contract to arbitrate arbitrability is included within that agreement, this Court is bound by the FAA to compel arbitration without weighing in on which variants of Sywula's

- 19 -

§ 256 claim is covered by the XPA.  *See* 9 U.S.C. § 3; *see also Henry Schein, Inc. v. Archer & White Sales, Inc.*, 139 S. Ct. 524 (2019) (holding that, "if a valid agreement exists, and if the agreement delegates the arbitrability issue to an arbitrator, a court may not decide the arbitrability issue" but instead "must compel arbitration 'in accordance with the terms of the agreement'").

Nonetheless, Sywula argues that this Court cannot compel arbitration—at least not Sywula's § 256 claim concerning three of the five Subject Patents.  (Opp'n at 6:17–7:22.)  Those Patents, Sywula claims, are not covered by the XPA's Arbitration Provision because they do not constitute Xelerate IP.  (Opp'n at 7:3-6.)  Unlike the '250 and '500 Patents, into which the Xelerate IP matured, the '252, '253, and '709 Patents are merely continuation-in-part patents of the Xelerate IP.  (*See* Eastman Decl. ¶¶ 4–7.)[6]  That is, although the '252, '253, and '709 Patents are "related to similar technology" as the Xelerate IP, they do not list the Xelerate IP in their prior publication data and are directly derived from other applications.  (*See* Opp'n at 7:7-8.)  Pointing to Section 3, Sywula avers that continuation-in-part patents, like the '252, '253, and '709 Patents, are explicitly excised from the XPA's coverage.  (*Id.*)  That provision states, "[A]ny further intellectual property . . . related to" the Xelerate IP, including "continuation-in-part patents, . . . will not be restricted by [the XPA] and may be governed by another contract."  (XPA § 3.)  Sywula, therefore, contends the XPA does not confer a right to compel disputes pertaining to Subject Patents that do not fit within the narrow definition of Xelerate IP.  (Opp'n at 6:17–7:22.)  But Sywula's argument is flawed both as a matter of contractual interpretation and as a matter of law.

First, Sywula conflates the scope of the XPA's definition of Xelerate IP with the scope of its Arbitration Provision.  While the former is narrow, the latter is broad.  The Arbitration Provision comprises an agreement not just to arbitrate disputes concerning the

---

[6] Eastman attaches to his Declaration—loosely and without exhibit pages—excerpts of the Subject Patents.  (Excerpts of the Subject Patents, annexed to Eastman Decl.)  Only the '250 and '500 Patents list the Xelerate IP in their prior publication data.

Xelerate IP, but to arbitrate "[a]ny case or controversy arising out of or *relating* to" the XPA. (XPA § 19 (emphasis added).) Because Sywula, himself, concedes the '252, '253, and '709 Patents are related to the Xelerate IP (*see* Opp'n at 7:7-8), this entire Inventorship Action "touches" upon the subject matter of the XPA and, thus is covered by the Arbitration Provision. *See Simula, Inc. v. Autoliv, Inc.*, 175 F.3d 716, 721 (9th Cir. 1999) (instructing the phrase "arising out of or relating to" in an arbitration agreement must be construed broadly, and the factual allegations at issue "need only touch matters covered by the contract containing the arbitration clause").

The language in the XPA to which Sywula cites—that any continuation-in-part patent subsequently invented by one of the parties "will not be restricted by [the XPA] and may be governed by another contract"—does not militate a different conclusion. (*See* XPA § 3.) Sywula does not point to any other agreement between the parties governing the forum in which disputes concerning the '252, '253, and '709 Patents should be resolved. Indeed, neither the Consulting Agreement nor the Inventions Agreement contains an arbitration provision. Thus, Sywula fails to show the expansive reach of the XPA's Arbitration Provision is cut off from disputes concerning the '252, '253, and '709 Patents in light of some other agreement.

Even more fundamentally, the Supreme Court recently foreclosed arguments like Sywula's. In *Henry Schein, Inc. v. Archer and White Sales, Inc.*, 139 S. Ct. 524 (2019) ("*Schein*"), the Court noticed a trend among district courts that it found troubling: "[e]ven when a contract [] delegate[s] the arbitrability question to an arbitrator, some federal courts nonetheless will short-circuit the process and decide the arbitrability question themselves if the argument that the arbitration agreement applies to a particular dispute is 'wholly groundless.'" *Id.* at 528–29. The *Schein* Court concluded that this approach is inconsistent with the FAA. "When the parties' contract delegates the arbitrability question to the arbitrator," the FAA demands that "courts must respect the parties' decision as embodied in the contract." *Id.* at 531. *Schein* elucidates that Sywula's arbitrability argument is misdirected. Because there exists a valid agreement to delegate arbitrability to the

21cv01450

arbitrator, Sywula must raise his contentions concerning the scope of the Arbitration Provision's coverage to the arbitrator—not this Court.

### D.   Request to Stay

As part of its Motion, Teleport requests a stay pending arbitration.  (*See* Reply at 8:13–9:1.)  DaCosta and Coletti join in that request.  Under the FAA, a court may stay the trial of an action pending arbitration when it is satisfied the issues in dispute are referable to arbitration under the parties' arbitration agreement.  *See* 9 U.S.C. § 3.  For the reasons stated above, *supra* Sec. III.A–C, the Court is satisfied the FAA's requirements for a stay are met.  Accordingly, this action is stayed pursuant to 9 U.S.C. § 3.

## IV.   CONCLUSION

Accordingly, the Court **HEREBY ORDERS**:

1.     Teleport's Motion to compel arbitration is **GRANTED** (ECF No. 80).

2.     The parties must proceed to JAMS for a determination of arbitrability and possible arbitration in the manner provided under Section 19 of the XPA.

3.     The action is **STAYED** as to all parties and claims.

4.     The Clerk of Court is **DIRECTED** to **ADMINISTRATIVELY CLOSE** this case.

**IT IS SO ORDERED.**

**DATED: July 18, 2023**

Hon. Cynthia Bashant
United States District Judge

21cv01450